[Cite as *State v. Brown*, 2018-Ohio-899.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    CASE NO. 5-17-19

    v.

NATHAN S. BROWN,

    **O P I N I O N**

    DEFENDANT-APPELLANT.

---

**Appeal from Hancock County Common Pleas Court**
**Trial Court No. 2016-CR-335**

**Judgment Affirmed**

**Date of Decision: March 12, 2018**

---

APPEARANCES:

    *Ronald L. Frey* **for Appellant**

    *Steven M. Powell* **for Appellee**

**WILLAMOWSKI, P.J.**

{¶1} Defendant-appellant Nathan S. Brown ("Brown") appeals the judgment of the Hancock County Court of Common Pleas, alleging (1) that his convictions were not supported by sufficient evidence; (2) that his convictions were against the manifest weight of the evidence; (3) that the State violated his Fifth Amendment rights by failing to preserve evidence; and (4) that he was denied his right to the effective assistance of counsel as guaranteed by the Sixth Amendment. For the reasons set forth below, the judgment of the lower court is affirmed.

*Facts and Procedural History*

{¶2} Jarrod T. Barger ("Jarrod") lived in Findlay, Ohio with his brother, Michael Barger ("Michael"), and worked at a nearby Outback Steakhouse ("Outback") with Brown. Tr. 249, 350. On January 10, 2016, Brown was working at Outback, and Jarrod, who had the day off from work, was at home. Ex. 33A. Tr. 331, 342. Through text messages and phone calls, Jarrod and Brown were in contact with each other throughout the day. Ex. 33A. Tr. 331, 469. While the text messages did not mention any controlled substances by name, these texts contained several references to "white stuff," "points," and "injections." Ex. 33A. Tr. 489, 491-492, 496. At trial, Officer Fred Smith testified that these terms referenced cocaine and heroin. Tr. 489, 491-492. The text messages indicate that Brown coordinated a transaction with Jarrod in the afternoon and later arranged a meeting with Jarrod late in the evening near Outback. Ex. 33A. Michael later testified at trial that he

-2-

saw Jarrod leaving the house at around 10:30 P.M. as he (Michael) was going upstairs to bed. Tr. 334. Michael further testified that this was the last time that he saw Jarrod alive. Tr. 335.

{¶3} On January 11, 2016, Michael was preparing to go to work and saw that the light was on in Jarrod's room. Tr. 336. Michael entered the room to turn the light off and saw Jarrod "slouched over" on the floor. Tr. 336. Michael called 911 after he determined that Jarrod was unresponsive. Tr. 336. The paramedics arrived shortly thereafter and pronounced Jarrod dead at 7:43 A.M. Tr. 313. The police investigating the scene discovered a hypodermic needle next to Jarrod and several other implements that are often associated with the administration of heroin. Tr. 385-386, 388-389. The police also found a folded piece of paper that contained roughly one-tenth of a gram of a powdery substance. Tr. 392, 573. Ex. 16, 17. This powdery substance was later tested and was found to contain a mixture of fentanyl and heroin. Tr. 575. Ex. 34, 36. An autopsy was performed on Jarrod, which determined that Jarrod died of a lethal dose of fentanyl. Tr. 510. Ex. 35.

{¶4} Jarrod's phone was on his bed when Michael entered Jarrod's room on the morning of January 11, 2016. Tr. 341. Ex. 5, 18, 19, 33A. During their investigation, the police discovered the text messages between Jarrod and Brown. Tr. 456-457. Brown was listed as "Naythan Brown" in Jarrod's contact list. Tr. 478. Ex. 33A. The police then questioned Brown. Tr. 468. During this interview, Brown admitted that he texted with Jarrod on January 10, 2016. Tr. 468-469. On

December 13, 2016, Brown was charged with one count of corrupting another with drugs in violation of R.C. 2925.02(A)(3) and one count of involuntary manslaughter in violation of R.C. 2903.04(A). Doc. 1.

{¶5} The trial commenced on March 29, 2017. Doc. 104. The State called Jarrod's mother and sister as witnesses to identify a picture of Jarrod and discuss his history of substance abuse. Tr. 230, 262. Defense counsel did not cross examine either of these witnesses. Tr. 251, 273. The Defense challenged the admission of the text messages between Brown and Jarrod, arguing that the State could not authenticate the communications. Tr. 277, 296. The trial court, however, determined that the messages had been properly authenticated and admitted this evidence. Tr. 306, 472-473. The State then questioned Detective Fred Smith about the content of the text messages and the process by which the police obtained these communications. Tr. 456, 489. Detective Rodney Smith testified about the parameters that were established for the search of the phone. Tr. 442. The police downloaded the text messages, contact files, and phone logs from Jarrod's phone, but did not retain all of the contents of the phone. Tr. 442-444.

{¶6} The jury found Brown guilty of both criminal counts on March 29, 2017. Doc. 53, 54. The trial court entered its sentencing order on June 12, 2017. Doc. 66. Brown filed his notice of appeal on July 5, 2017. Doc. 90. In this appeal, he raises the following assignments of error:

## First Assignment of Error

**The trial court erred when it denied Mr. Brown's motion for judgment of acquittal pursuant to Crim.R. 29(A). The State of Ohio failed to introduce sufficient evidence to sustain the convictions in this case.**

## Second Assignment of Error

**The convictions are against the manifest weight of the evidence.**

## Third Assignment of Error

**Mr. Brown's right to due process, as guaranteed by the Fifth Amendment to the Constitution of the United States of America and made applicable to the states by and through the Fourteenth Amendment to the Constitution of the United States of America, was violated when the State failed to preserve Mr. Jarrod Barger's cellular telephone.**

## Fourth Assignment of Error

**Mr. Brown was denied his fundamental right to effective assistance of counsel as guaranteed by the Sixth Amendment to the Constitution of the United States of America and made applicable to the states by and through the Fourteenth Amendment to the Constitution of the United States of America.**

For the sake of analytical clarity, we will consider appellant's second assignment of error first. We will then consider his first, third, and fourth assignments of error.

### *Second Assignment of Error*

{¶7} In the second assignment of error, appellant argues that his convictions are against the manifest weight of the evidence. First, appellant argues that the State did not establish that Brown furnished Jarrod with fentanyl. Second,

appellant argues that any evidence that the State did provide suggesting that Brown provided Jarrod with fentanyl was contradicted by other evidence.

Legal Standard

**{¶8}** When "deciding whether a conviction is against the manifest weight of the evidence, an appellate court determines whether the state has appropriately carried its burden of persuasion." *State v. Blanton*, 121 Ohio App.3d 162, 169, 699 N.E.2d 136 (3d Dist.1997). "Unlike our review of the sufficiency of the evidence, an appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict." *State v. Plott*, 2017-Ohio-38, 80 N.E.3d 1108, ¶ 73 (3d Dist.). "In a manifest weight analysis, 'the appellate court sits as a 'thirteenth juror' * * *.'" *State v. Davis*, 3d Dist. Seneca No. 13-16-30, 2017-Ohio-2916, ¶ 17, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

> **On appeal, courts "must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"**

*Brentlinger, supra,* at ¶ 36, quoting *Thompkins* at 387.

**{¶9}** "A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses." *State v. Sullivan*, 3d Dist. Hancock No. 5-17-09, 2017-Ohio-8937, ¶ 38,

quoting *State v. Coleman*, 3d Dist. Allen No. 1-13-53, 2014-Ohio-5320, ¶ 7. "Only in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Little*, 2016-Ohio-8398, 78 N.E.3d 323, ¶ 27 (3d Dist.), quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119.

**{¶10}** In this case, Brown was convicted of corrupting another with drugs in violation of R.C. 2925.02(A)(3). Thus, the State had to establish that Brown (1) knowingly (2) by any means, furnished to another (3) a controlled substance (4) and thereby caused serious physical harm to that person. R.C. 2925.02(A)(3). "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). A controlled substance is "a drug, compound, mixture, preparation, or substance included in schedule I, II, III, IV, or V." R.C. 3719.01(C). *See* R.C. 2925.01(A), R.C. 3719.41. The offense of corrupting another with drugs is a felony of the second degree. R.C. 2925.02(C)(1)(a).

**{¶11}** For a conviction of involuntary manslaughter, under R.C. 2903.04(A), the State had to establish that Brown (1) caused the death of another (2) as a proximate result (3) of the offender's committing a felony. R.C. 2903.04(A). The "criminal intent of involuntary manslaughter is supplied by the criminal intent to do the underlying unlawful act of which the homicide is a consequence." *State v. Potee*, 2017-Ohio-2926, --- N.E.3d ---, ¶ 32 (12th Dist.). *State v. Mansfield*, 2016-

Ohio-8189, 69 N.E.3d 767, ¶ 18 (2d Dist.); *State v. Grube*, 2013-Ohio-692, 987 N.E.2d 287, ¶ 39 (4th Dist.); *State v. Lutman*, 6th Dist. Lucas No. L-97-1447, 1999 WL 435196, *6 (June 30, 1999); *State v. Losey*, 23 Ohio App.3d 93, 491 N.E.2d 379 (10th Dist.1985). Under R.C. 2903.04, the

> **defendant will be held responsible for those foreseeable consequences which are known to be, or should be known to be, within the scope of the risk created by his conduct. Here, that means that death reasonably could be anticipated by an ordinarily prudent person as likely to result under these or similar circumstances.**

(Citations omitted.) *State v. Shoemaker*, 3d Dist. Union No. 14-06-12, 2006-Ohio-5159, ¶ 65 (holding the victim's "death, resulting from a morphine overdose, could have reasonably been anticipated by an ordinarily prudent person as likely to result from Shoemaker's trafficking in morphine."), quoting *Losey* at 94-95.

Legal Analysis

{¶12} At trial, Jarrod's brother testified that he discovered Jarrod on the morning of January 11, 2016. Tr. 357-358. Shortly thereafter, when the police arrived at Jarrod's house on January 11, 2016, the police observed Jarrod on his back, lying next to his bed in his room. Tr. 358, 386-387. Jarrod had a hypodermic needle next to his body. Tr. 339, 385-386. On the dresser, the police found a Q-tip, syringe caps, a lighter, and a spoon with drug residue on it. Tr. 388-389. Ex. 11, 12. Deputy Thomas L. Miller ("Deputy Miller") of the Hancock County Sheriff's

Office testified that these were items frequently used in the administration of heroin. Tr. 388-392.

{¶13} Miller discovered a piece of brown paper on the dresser that contained a brown, powdery substance. Tr. 391-392. Kelsey Degen ("Degen"), a forensic scientist at the Ohio Bureau of Criminal Investigations, tested this substance on March 31, 2016. Tr. 563. Degen testified that this substance weighed one tenth of a gram and was composed of heroin and fentanyl. Tr. 573, 575. Ex. 34, 36. Dr. Mark Fox ("Dr. Fox"), the county coroner, testified that fentanyl is being added to heroin, which is leading to overdose deaths. Tr. 318. He then testified that he has also seen overdose deaths after fentanyl was used by itself. Tr. 318. Dr. Fox identified Jarrod's death certificate during his testimony, which showed that Jarrod was pronounced dead at 7:43 A.M. on January 11, 2016. Tr. 313-314. Ex. 34.

{¶14} The police also discovered Suboxone on Jarrod's dresser. Tr. 390, 396. Ex. 12. Jarrod's brother and sister testified that Jarrod had been prescribed Suboxone to help with his heroin addiction. Tr. 265, 329. Dr. Robert Fortney ("Dr. Fortney"), a toxicologist at the Lucas County Coroner's Office, testified that Suboxone contains Buprenorphine and Naloxone. Tr. 552. Neither Buprenorphine nor Naloxone was listed in the toxicology report as being present in Jarrod's system. Ex. 35. Dr. Fortney testified that these drugs would have been detected by the tests that he performed. Tr. 552. He also testified that Suboxone does not contain morphine. Tr. 551. The record does not indicate that any other drugs were found

in Jarrod's room, though marijuana paraphernalia was discovered "tucked away" in a plastic container on the other side of Jarrod's bed.   Tr. 383, 396-397.

**{¶15}** During their investigation, the police discovered Jarrod's phone on his bed.  Tr. 242, 267, 384-385.  At trial, the phone was identified by his mother, sister, brother, and Deputy Tom Miller of the Hancock County Sheriff's Office.  Tr. 244, 267, 344, 385.  Michael testified that he had seen his brother texting from this phone throughout the day on January 10, 2016.  Tr. 332.  After examining the contents of the phone, the police discovered that Jarrod had been in contact with a person listed as "Naythan Brown" in Jarrod's phone's contact list.  Tr. 246-247, 332, 478.

**{¶16}** Officer Fred Smith testified that he then interviewed Brown, who admitted that he had spoken with Jarrod on the night of January 10, 2016 and had texted with him that day.  Tr. 468.  Brown was also able to recite the first few digits of Jarrod's phone number.  Tr. 469.  At trial, the text messages were identified by Officer Fred Smith.  Tr. 475-476.

| Time | Type | From | To | Duration of Call/Content of Text |
|------|------|------|-----|----------------------------------|
| 12:40 P.M. | Text | Brown | Jarrod | My bad I crashed |
| 12:48 P.M. | Text | Jarrod | Brown | It's all good brotha |
| 12:48 P.M. | Text | Brown | Jarrod | Been at work since 11 just got my phone on trying to make a run when I get on break soon |
| 12:52 P.M. | Text | Jarrod | Brown | Well where u gettin it from |
| 12:53 P.M. | Text | Brown | Jarrod | Dude from yesterday unless drizzy has ima try him |

| 12:55 P.M. | Text | Jarrod | Brown | Ok well as long as it's good s--- I'm diwn |
|---|---|---|---|---|
| 12:56 P.M. | Text | Brown | Jarrod | Either ones dank lol |
| 12:56 P.M. | Text | Brown | Jarrod | Ima have to hurry tho whenever I get break what u thinking? |
| 12:56 P.M. | Text | Jarrod | Brown | Well yeah but that same dude had diff stuff 2 days n a row |
| 12:58 P.M. | Text | Jarrod | Brown | I'll take 80 my n-- |
| 12:58 P.M. | Text | Brown | Jarrod | I think the first was cuz its all be had left and alright soon as I hit break I'll b with ya |
| 12:59 P.M. | Text | Jarrod | Brown | Ok. And I don't have the cash all I got is my card.  Is that cool bro? |
| 1:04 P.M. | Text | Brown | Jarrod | Idk when I'm getting break I'm not gunna ask u to ride n snow to get it I'll make Ben take me |
| 1:06 P.M. | Text | Jarrod | Brown | I was gonna say in will if I absolutely need to |
| 1:07 P.M. | Text | Jarrod | Brown | But I'd really appreciate that |
| 1:08 P.M. | Text | Brown | Jarrod | That's up to u I'm tryna find when I get break now…drizzy good |
| 1:11 P.M. | Text | Jarrod | Brown | Well if you would do it for me I'd rather do that bit like if I'm forced to go then I will. And f---yeah! About time |
| 1:11 P.M. | Text | Jarrod | Brown | Do you have any cigs? |
| 1:13 P.M. | Text | Brown | Jarrod | Nooe |
| 1:13 P.M. | Text | Jarrod | Brown | Well if u buy me a pack I'll buy u a pack too |
| 1:17 P.M. | Text | Brown | Jarrod | Say what |
| 1:18 P.M. | Text | Jarrod | Brown | If u buy me a pack with my card I'll also buy u a pack |

| 1:22 P.M. | Text | Brown | Jarrod | Ooo I gotcha now…yeah I can do that brotha |
|---|---|---|---|---|
| 1:27 P.M. | Text | Jarrod | Brown | Ight well shell doesn't carry my brand of cigs. Do you know where u gotta meet drizz? The econo? |
| 1:28 P.M. | Text | Jarrod | Brown | Cause I want camel Turkish Royals but I'll settle for L&Ms Turkish blends if I have to |
| 1:29 P.M. | Text | Brown | Jarrod | I'm not sure where he is yrt |
| 1:30 P.M. | Text | Jarrod | Brown | Ok well I guess depending on where he's at, try n stop by something along the way. If shells the only place on the way then so be it |
| 1:37 P.M. | Text | Brown | Jarrod | Heard that i m getting notice when I go to break I'll let you know asap |
| 1:39 P.M. | Text | Jarrod | Brown | Ight brotha sounds good |
| 2:04 P.M. | Text | Brown | Jarrod | Break now u home |
| 2:04 P.M. | Text | Jarrod | Brown | Yeasir |
| 2:07 P.M. | Call | Brown | Jarrod | 1 Minute, 13 Seconds |
| 2:32 P.M. | Text | Jarrod | Brown | What's up bra |
| 2:36 P.M. | Call | Brown | Jarrod | 1 Minute, 13 Seconds |
| 2:39 P.M. | Text | Brown | Jarrod | That was fat an no cut at all I'm kinda testing Ben to see if he f---- around it was all tucked n the cigg |
| 2:40 P.M. | Text | Jarrod | Brown | Ok he should be here soon if he not f----- with it |
| 2:40 P.M. | Text | Brown | Jarrod | Exactly |
| 3:44 P.M. | Text | Brown | Jarrod | I think I almost like the white stuff better |

| Time | Type | From | To | Message |
|---|---|---|---|---|
| 3:54 P.M. | Text | Jarrod | Brown | Really?  I'm not sure how I feel about it yet. But ingot digis last night and I'm prolly gonna weigh this n see what's up $ |
| 4:00 P.M. | Text | Brown | Jarrod | Yeah I had to bust mine out to splt it down |
| 4:11 P.M. | Text | Jarrod | Brown | Yeah it just seemed a lil small than normal.  I could be wrong tho so that's why imma weigh it |
| 5:48 P.M. | Text | Brown | Jarrod | That s--- said .39 when it left my hands…so u did some then weighed it or what? |
| 6:04 P.M. | Text | Brown | Jarrod | He swears he didn't touch it |
| 6:07 P.M. | Text | Jarrod | Brown | Yeah bro. Bit im tellingy you it was only a point point and a half that I did first |
| 6:08 P.M. | Text | Jarrod | Brown | Anymore and I'd be on the floor unconsious |
| 6:09 P.M. | Text | Brown | Jarrod | So the tooth fairy came in and nabbed it up huh |
| 6:09 P.M. | Text | Brown | Jarrod | So what was it total then with what u did and what was left cuz I said something to him and he got all defensive….how long did it take for him to get to u |
| 6:11 P.M. | Text | Jarrod | Brown | Prolly .23 total and it took him like 5 mins. |
| 6:14 P.M. | Text | Brown | Jarrod | Hmmmm…how was it packaged |
| 6:14 P.M. | Text | Jarrod | Brown | It seemed like it took him a lil longer than usual. And normally I can get like 4 to 5 shots out it but now I'm lucky I'm gonna get 4 |
| 6:14 P.M. | Text | Brown | Jarrod | Sry I'm trying to figure this out man I'm rather pissed |
| 6:15 P.M. | Text | Jarrod | Brown | Lucky in gonna get 3**** sorry a little f----- up can't rype |
| 6:17 P.M. | Text | Jarrod | Brown | It was in a black paper wrapped in my receipt in my cig cellophane under my debit csr!% |
| 6:18 P.M. | Text | Brown | Jarrod | Gunna get what? Ok well hmmn wtf |

| 6:22 P.M. | Text | Jarrod | Brown | I'm lucky I'm gonna get 3 shots out of the thing |
|---|---|---|---|---|
| 7:34 P.M. | Text | Brown | Jarrod | O I hear ya buddy I'm sorry seriously I'm ripping him a new a-- |

Ex. 33A.

{¶17} After the prosecution introduced this segment of the text messages, Detective Fred Smith testified that he believed "white stuff" referred to cocaine and that "points" refers to a quantity of drugs. Tr. 489, 491-492. In his experience, "points" was generally used as the measure of heroin as this is the drug that is sold in an amount that small. Tr. 491. He then testified that the number of shots referenced by Jarrod referred to the "usage dose that he's going to use as far as an injection * * *." Tr. 493.

{¶18} He also testified that the "80" in this series of text messages referred to a sum of cash. Tr. 483. Jarrod's mother testified at trial that she knew about Jarrod's drug addiction. To help him, she would monitor his bank account and would watch for withdrawals of forty or eighty dollars because these were the amounts that he would withdraw if he wanted to purchase drugs. Tr. 249-250. Further, Detective Fred Smith testified that the Econo Lodge was a location in Findlay that was known for drug trafficking. Tr. 488. The rest of the text messages read as follows:

| 7:35 P.M. | Text | Jarrod | Brown | If worse comes to worse can u get me more? Today is literally my last f----- day I swear to god |
|---|---|---|---|---|

| 8:04 P.M. | Text | Brown | Jarrod | Whe. Brotha I'm bout off work |
|---|---|---|---|---|
| 8:07 P.M. | Text | Jarrod | Brown | Whenever convenient for you |
| 8:15 P.M. | Text | Brown | Jarrod | I'll bet with you soon buddy |
| 8:25 P.M. | Text | Jarrod | Brown | Ok sweet |
| 8:46 P.M. | Text | Jarrod | Brown | So what's up buddy |
| 8:50 P.M. | Text | Brown | Jarrod | Just got off work |
| 8:51 P.M. | Call | Brown | Jarrod | 1 Minute, 13 Seconds |
| 8:55 P.M. | Call | Brown | Jarrod | 0 Minutes, 15 Seconds |
| 9:07 P.M. | Call | Brown | Jarrod | 0 Minutes, 19 Seconds |
| 9:18 P.M. | Text | Brown | Jarrod | We had to stop I f----- ralphed all over |
| *** | *** | *** | *** | *** |
| 9:21 P.M. | Text | Brown | Jarrod | I keep puking all over..I feel bad and I nodded out at work my boss pulled me aside like whats up |
| 9:30 P.M. | Text | Jarrod | Brown | I kno u told me already bro. When u gonna be back |
| 9:35 P.M. | Text | Jarrod | Brown | ? |
| 9:36 P.M. | Text | Brown | Jarrod | Soon I'm sorry man |
| 9:42 P.M. | Call | Jarrod | Brown | N/A |
| 9:42 P.M. | Text | Jarrod | Brown | How soon? |

| 9:45 P.M. | Text | Brown | Jarrod | Ten mins |
|---|---|---|---|---|
| 9:51 P.M. | Text | Brown | Jarrod | These scales are f----- up dude |
| *** | *** | *** | *** | *** |
| 9:56 P.M. | Text | Brown | Jarrod | I'm leaving….I watched my buddy weigh up the .7 I needed and this is telling me a half g just f--- it whatecer |
| *** | *** | *** | *** | *** |
| 10:01 P.M. | Text | Jarrod | Brown | I'll b outside.  Where is u |
| 10:04 P.M. | Call | Jarrod | Brown | 1 Minute, 15 Seconds |
| 10:07 P.M. | Call | Jarrod | Brown | 0 Minutes, 29 Seconds |
| 10:08 P.M. | Text | Jarrod | Brown | Txt me when ur by outback |
| 10:18 P.M. | Text | Jarrod | Brown | ??? |
| 10:21 P.M. | Text | Brown | Jarrod | On way dude I'm.so f------ pissed off |
| 10:21 P.M. | Call | Jarrod | Brown | 0 Minutes, 41 Seconds |
| 10:32 P.M. | Text | Brown | Jarrod | Passing g outbsck |
| 10:33 P.M. | Text | Jarrod | Brown | Ok cook I'll b down at the spot |
| 10:33 P.M. | Call | Jarrod | Brown | 0 Minutes, 21 Seconds |
| 10:48 P.M. | Text | Brown | Jarrod | I'm sry brotha…I'm so stressed out trying to make sure i take care of everyone and not f--- anyone over and end up dicking myself..think im just too high |

| 10:53 P.M. | Text | Brown | Jarrod | I keep saying sorry to everyone and Ben ran out of gas..just fell like a f----- dumba-- |
|---|---|---|---|---|

Ex. 33A. As this segment of the text messages was introduced at trial, Detective Fred Smith testified that "a G is what they refer to for a gram." Tr. 496.

{¶19} Michael testified at trial that he was home "all day." Tr. 332. He also testified that his house, where he and Jarrod lived at the time of Jarrod's death, was in close proximity to Outback. Tr. 324. He also testified that Jarrod did not have a driver's license and was "hanging out at the house" during the day on January 10, 2016. Tr. 332. He testified that Jarrod would occasionally step outside into the garage to smoke a cigarette because the terms of their lease prohibited smoking inside the house. Tr. 333. He also said that Jarrod "had his cell phone on him at all times. * * * [W]hen I would see him out in the garage texting he would just be smoking a cigarette or texting." Tr. 332-333. Michael then testified that he did not see anyone else come inside his house on January 10, 2016. Tr. 342. Michael testified that Jarrod left the house around "10:30-ish" P.M.[1] Tr. 334. Michael observed Jarrod "putting on his shoes, he had his coat on, he was putting on his shoes about to exit the garage door to go inside the garage and that was the last time I saw him." Tr. 334.

---

[1] On January 11, 2016, Michael told the police that he believed he went to bed at 11:00 P.M. on the night of January 10, 2016. Tr. 347. At trial, Michael stated that he usually went to bed in between 10:00 and 10:30 P.M. Tr. 334. He testified that he saw Jarrod after he (Michael) got up to get a glass of water. Tr. 334. He also testified that he was unsure as to what time he went to bed on the night of January 10, 2016. Tr. 334. Since he usually went to bed around 10:00 P.M., he thought that he saw Jarrod leaving the house at around 10:30 P.M. Tr. 334.

{¶20} Later at trial, Dr. Fortney testified that Jarrod had cocaine, morphine, and fentanyl in his system at the time of his death. Tr. 535-536, 537, 540. Ex. 35. However, the cocaine was not in Jarrod's blood, indicating to Dr. Fortney that Jarrod used cocaine at some point on the day of his death; that he was not under the influence of cocaine at the time of his death; and that "[t]he cocaine was not used near the time of his death." Tr. 540. Further, the level of morphine in Jarrod's system was relatively low and was not the cause of death. Tr. 537. The morphine that was present in Jarrod's system was consistent with heroin use and indicated that Jarrod had used either heroin or morphine within several hours of his death. Tr. 537-538. Ex. 35. However, Dr. Fortney could not, based upon the results of these tests, conclude with medical certainty whether Jarrod had taken heroin or morphine. Tr. 538.

{¶21} The toxicology report indicated that Jarrod had eighteen nanograms of fentanyl per milliliter of his blood. Tr. 519, 547-548. At trial, Dr. Fortney testified that a level of five nanograms of fentanyl per milliliter of blood was fatal and that therapeutic range of fentanyl use was between one or two nanograms of fentanyl per milliliter of blood. Tr. 547-548. Based on the results in this report, he determined that the cause of death was the fentanyl, stating that "but for the fentanyl there would be no death." Tr. 550. Dr. Fortney further testified that "the cause of death is respiratory depression but what caused the respiratory depression [was] the fentanyl." Tr. 547. Dr. Fortney could not pinpoint the exact time of death, but he

was able to conclude that death occurred shortly after Jarrod introduced the fentanyl into his system. Tr. 549. He also testified that fentanyl is a Schedule II drug under Ohio law. Tr. 543.

{¶22} Following our decision in *State v. Kramer*, 3d Dist. Defiance No. 4-15-14, 2016-Ohio-2984, we conclude that neither of Brown's convictions are against the manifest weight of the evidence. We find that competent, credible evidence exists as to all elements of each indicted charge. We do not find evidence in the record that indicates the jurors lost their way and made a decision that constitutes a manifest miscarriage of justice. The facts of this case do not present one of the exceptional circumstances in which a reversal of the jury's verdict is warranted. *Kramer* at ¶ 56, citing *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9. For these reasons, appellant's second assignment of error is overruled.

*First Assignment of Error*

{¶23} In the first assignment of error, appellant asserts that the trial court erred by denying his Crim.R. 29 motion, arguing his convictions were based on insufficient evidence. First, appellant claims that the State failed to establish that Brown knowingly furnished Jarrod with fentanyl or that Brown knowingly caused physical harm to Jarrod. Second, appellant argues that his conviction for involuntary manslaughter should be reversed since the predicate crime—his conviction for corrupting another with drugs—was based on insufficient evidence.

In addressing appellant's second assignment of error, we determined that the State presented evidence that substantiates each element of Brown's convictions. Rather than repeat this evidence, we will reincorporate these previous evidentiary findings and will then address the arguments that are particular to appellant's first assignment of error.

Legal Standard

**{¶24}** Crim.R. 29 reads, in its relevant part, as follows:

**(A) Motion for Judgment of Acquittal. The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses.**

Crim.R. 29(A). "An appellate court reviews a denial of a Crim.R. 29 motion for judgment of acquittal using the same standard that is used to review a sufficiency of the evidence claim. *Sullivan* at ¶ 11, quoting *State v. Carter*, 72 Ohio St.3d 545, 553, 651 N.E.2d 965 (1995).

**{¶25}** "A challenge to the sufficiency of the evidence supporting a conviction requires a court to determine whether the state has met its burden of production at trial." *State v. Brentlinger*, 2017-Ohio-2588, --- N.E.3d ---, ¶ 21 (3d Dist.), quoting *In re Swift*, 8th Dist. Cuyahoga No. 79610, 2002 WL 451226, 3 (March 21, 2002). "The sufficiency of the evidence analysis addresses the question of whether adequate evidence was produced for the case to be considered by the

trier of fact and, thus, whether the evidence was "legally sufficient to support the verdict * * *." *State v. Campbell*, 3d Dist. Allen No. 1-17-23, 2017-Ohio-9251, ¶ 13, quoting *State v. Worthington*, 3d Dist. Hardin No. 6-15-04, 2016-Ohio-530, ¶ 12.

{¶26} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Pierce*, 3d Dist. Seneca No. 13-16-36, 2017-Ohio-4223, ¶ 6, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668 (1997), fn. 4.

{¶27} "This analysis does not attempt to 'resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact.'" *Davis, supra,* at ¶ 13, quoting *State v. Eckard*, 3d Dist. Marion No. 9-15-45, 2016-Ohio-5174, ¶ 9. Thus, sufficiency of the evidence is a question of law and a "test of adequacy rather than credibility or weight of the evidence." *State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19. The standard for sufficiency of the evidence

> **is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that**

**the essential elements of the crime were proven beyond a reasonable doubt.**

*Plott, supra*, at ¶ 62.

Corrupting Another with Drugs Legal Analysis

**{¶28}** We begin this analysis by reincorporating the evidence discussed under the first assignment of error. In this case, appellant argues that the State failed to prove that he "knowingly furnished *Fentanyl* to [Jarrod]." (Emphasis added.) Appellant's Brief, 11. Under R.C. 2925.02(A)(3), however, the statute only requires that the State establish that Brown "knowingly * * * furnished" Jarrod with a "*controlled substance*." (Emphasis added.) R.C. 2925.02(A)(3). Thus, the State did not have to prove that Brown knew he was furnishing Jarrod with a controlled substance that contained fentanyl. *State v. Edmonds*, 8th Dist. Cuyahoga No. 104528, 2017-Ohio-745, ¶ 39, 43; (holding that the evidence was sufficient where "the evidence demonstrated that [the defendant] sold [the victim] the drugs that caused his death."); *State v. Wells*, 12th Dist. Warren No. CA2016-02-009, 2017-Ohio-420, ¶ 39. *See State v. Ward*, 3d Dist. Crawford No. 13-17-02, 2017-Ohio-8518, ¶ 15, (holding that the State had to establish that the defendant knowingly sold a controlled substance in order to be convicted under R.C. 2925.03(A)(1) and did not have to prove that the defendant "had actual knowledge that the heroin he sold contained fentanyl."), citing *State v. Patterson*, 69 Ohio St.2d 445, 447, 432 N.E.2d 802 (1982), *overruled in part on other grounds. State v. Veley*, 6th Dist. Lucas No.

L-16-1038, 2017-Ohio-9064, ¶ 26 (holding "[i]t is also immaterial that it was not proven (though it was suggested) that appellant added the fentanyl to the heroin."); *Potee, supra*, at ¶ 30 (holding the sufficiency analysis for convictions under R.C. 2925.02(A)(3) and R.C. 2925.03(A)(1) "does not contemplate whether appellant knew the type and amount of the [controlled] substance."). Based on applicable case law, we find that this particular argument is without merit.

{¶29} The appellant also argues that the State did not establish that "Brown knowingly caused serious physical harm." Appellant's Brief, 16. If Brown had been charged under R.C. 2925.02(A)(2), this argument might have merit. R.C. 2925.02(A)(2) reads, in its relevant part, as follows: "[n]o person shall knowingly * * * furnish to another * * * a controlled substance *with purpose* to cause serious physical harm to the other person." (Emphasis added.) R.C. 2925.02(A)(2). However, R.C. 2925.02(A)(3), which is the statute under which Brown was charged, reads, in its relevant part, as follows: [n]o person shall knowingly * * * furnish to another * * * a controlled substance, *and thereby cause* serious physical harm." (Emphasis added.) R.C. 2925.02(A)(3). Thus, for convictions under R.C. 2925.02(A)(3), the State does not need to prove that the defendant knowingly intended to cause serious physical harm. Rather, the State must prove that the defendant knowingly furnished another with drugs and that serious physical harm resulted from this intentional act. *See State v. Rutherford, Darby, Jones*, 9th Dist.

-23-

Summit Nos. 9521, 9522, and 9523, 1981 WL 3883, *10 (February 25, 1981). For this reason, this argument is without merit.

### Involuntary Manslaughter

{¶30} In this case, Brown's conviction for corrupting another with drugs is the predicate offense for his conviction of involuntary manslaughter. In this assignment of error, appellant challenged his involuntary manslaughter conviction on the grounds that its predicate conviction was not supported by sufficient evidence. Since we have found that Brown's arguments against his conviction for corrupting another with drugs are without merit, his conviction for involuntary manslaughter has a properly supported predicate conviction and withstands the sufficiency of the evidence analysis. After reviewing the record in a light most favorable to the prosecution, we find that Brown's convictions were based upon sufficient evidence. For this reason, his first assignment of error is overruled.

### *Third Assignment of Error*

{¶31} In his third assignment of error, appellant challenges the decision of the police to not download all of the data on Jarrod's cell phone as part of their investigation. In so doing, appellant claims that the police failed to preserve material exculpatory evidence in violation of Brown's due process rights. Alternatively, appellant asserts that the police, in failing to download all of the contents of Jarrod's phone, failed to preserve potentially useful evidence.

Legal Standard

**{¶32}** The State has a duty to preserve and disclose material evidence that is favorable to the Defense. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *See* Crim.R. 16(A).

> **However, the state has no duty to gather such exculpatory evidence. Rather, when the state has failed to gather exculpatory evidence or to fully investigate the allegations, the defendant may either investigate the charge and collect the evidence himself, if such evidence is available, or he may point out the deficiencies in the state's investigation at trial.**

(Citations omitted.) *State v. Farris*, 2d Dist. Clark No. Civ.A.2003 CA 77, 2004-Ohio-5980, ¶ 20. The State's failure to preserve evidence constitutes a due process violation in two main situations. *State v. Cahill*, 3d Dist. Shelby No. 17-01-19, 2002-Ohio-4459, ¶ 13.

**{¶33}** First, a due process violation exists where the State fails to preserve material exculpatory evidence. *State v. Geeslin*, 116 Ohio St.3d 252, 2007-Ohio-5239, 878 N.E.2d 1, ¶ 7, citing *State v. Johnston*, 39 Ohio St.3d 48, 529 N.E.2d 898 (1988).

> **Evidence is constitutionally material when it possesses 'an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'**

*State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 74, quoting *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413

(1984). The appellant need not establish that the State acted with bad faith in its failure to preserve material exculpatory evidence. *State v. Parsons*, 2017-Ohio-1315, 88 N.E.3d 624, ¶ 79, citing *Trombetta* at 489. "The defendant bears the burden to show that the evidence was materially exculpatory." *Powell* at ¶ 74.

{¶34} Second, a due process violation exists where the State fails to preserve potentially useful evidence in bad faith. *Powell* at ¶ 77, citing *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). "[P]otentially useful evidence is evidence that if subjected to tests, the results of which, might have exonerated the defendant." *Parsons* at ¶ 80, quoting *State v. Frasure*, 11th Dist. Ashtabula No. 2007-A-0033, 2008-Ohio-1504, ¶ 6. However, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Powell* at ¶ 76. "Bad faith implies more than bad judgment or negligence, rather '[i]t imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud.'" *Parsons* at ¶ 80, quoting *Powell* at ¶ 81.

Material Exculpatory Evidence Analysis

{¶35} On March 28, 2017, the State submitted an additional discovery disclosure. Doc. 51. This document had a phone examination report that showed that the State had downloaded all of the text messages, contacts, notes, multimedia messages, images, and phone logs that were on Jarrod's phone. Doc. 51. This report

also showed that Jarrod's e-mail communications and web browsing history were not downloaded as part of the police investigation. Doc. 51. At trial, only a small subset of this data—the text messages, phone logs, and contact information from January 10-11, 2016—was admitted into evidence. Ex. 33A.

**{¶36}** On appeal, appellant argues that the phone was material to guilt and that all of the cell phone's content should have been preserved. However, appellant does not demonstrate how the web browsing history and e-mail communications had an apparent exculpatory value at the time of this download. The fact that some of the contents of the phone—the text messages, phone logs, and contact lists— were material to guilt or punishment does not establish that all of the contents of the phone were material to guilt or punishment. Moreover, appellant has failed to establish that the contents that were not downloaded were exculpatory.

**{¶37}** Since appellant has not demonstrated on appeal how the web browsing history and e-mail communications had an apparent value as material exculpatory evidence, the assertion that the web browsing history and e-mail communications on Jarrod's cell phone were material exculpatory evidence is speculative. *State v. Brown*, 2017-Ohio-8416, --- N.E.3d ---, ¶ 53 (2d Dist.) (holding "it is wholly speculative to assume that the part of the tapes not copied by the police showed any potentially exculpatory evidence."). Thus, appellant has not carried the burden of establishing that the State failed to preserve material exculpatory evidence and, therefore, has not established that a due process violation occurred.

Potentially Useful Evidence Analysis

{¶38} At trial, Detective Rodney Smith testified as to the parameters of the police investigation into Jarrod's cell phone. Tr. 443, 445-446. The police stayed within these parameters and downloaded the information from the cell phone that was determined to be within scope of this investigation. Tr. 457-458. Doc. 51. The State then returned the cell phone to Jarrod's family. Tr. 457-458. On appeal, appellant fails to identify facts in the record that show the State acted in bad faith during this process. Rather, appellant merely asserts that the State acted in bad faith. Thus, appellant has failed to carry the burden of establishing that the State acted in bad faith and of establishing that a due process violation occurred. For these reasons, appellant's third assignment of error is overruled.

*Fourth Assignment of Error*

{¶39} In his fourth assignment of error, appellant argues that his trial counsel committed two errors that denied him his right to the effective assistance of counsel. First, appellant argues that Brown's trial counsel failed to file a motion that would preserve all of the contents of Jarrod's phone; failed to request access to Jarrod's phone; and failed to file a motion to dismiss after discovering the police did not preserve all of the contents of Jarrod's phone. Second, appellant argues that his trial counsel failed to cross examine several of the State's witnesses and failed to use cross examination to present an alternate theory of this case.

Legal Standard

**{¶40}** "In *Strickland v. Washington*, the Supreme Court of the United States established a two-prong test for determining whether a criminal defendant was denied the effective assistance of counsel." *Davis*, *supra*, at ¶ 35, citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984). Under the first prong of the Strickland test,

> **the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.**

*State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.3d 905 (1999), quoting *Strickland* at 687. "In order to show deficient performance, the defendant must prove that counsel's performance fell below an objective level of reasonable representation." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 95. "Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available." *State v. Conley*, 2015-Ohio-2553, 43 N.E.3d 775, ¶ 56, citing *State v. Cook*, 65 Ohio St.3d 516, 524, 605 N.E.2d 70 (1992). "A reviewing court may not second-guess decisions of counsel which can be considered matters of trial strategy." *Conley* at ¶ 56, citing *State v. Smith*, 17 Ohio St.3d 98, 477 N.E.2d 1128 (1985).

**{¶41}** To satisfy the second prong of the Strickland test,

> **the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.**

*Calhoun* at 289, quoting *Strickland* at 687. "To show prejudice, the defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *State v. Bibbs*, 2016-Ohio-8396, 78 N.E.3d 343, ¶ 13 (3d Dist.), quoting *Conway* at ¶ 95. Appellate courts examine the record to determine "whether the accused, under all the circumstances, * * * had a fair trial and substantial justice was done." *State v. Rodriquez*, 3d Dist. Defiance No. 4-16-16, 2017-Ohio-1318, ¶ 9, quoting *State v. Hester*, 45 Ohio St.2d 71, 341 N.E.2d 304 (1976), paragraph four of the syllabus.

**{¶42}** "Under Ohio law, 'a properly licensed attorney is presumed to carry out his duties in a competent manner.'" *State v. Howton*, 3d Dist. Allen No. 1-16-35, 2017-Ohio-4349, ¶ 34, quoting *State v. Gee*, 3d Dist. Putnam No. 12-92-9, 1993 WL 270995 (July 22, 1993). For this reason, the petitioner has the burden of proving that counsel was ineffective at trial. *Id*. "The failure to prove either 1) a substantial violation or 2) prejudice caused by the violation makes it unnecessary for a court to consider the other prong of the test." *Walker* at ¶ 20, citing *State v. Anaya*, 191 Ohio App.3d 602, 2010-Ohio-6045, 947 N.E.2d 212, ¶ 25.

Legal Analysis

**{¶43}** We will first address the argument that the decision of trial counsel not to address the preservation of all of the contents of Jarrod's cell phone. In this case, the Defense's trial strategy was to challenge the admission of the text messages, raising an authentication issue at trial. Tr. 277, 290, 296, 306, 472-473, 582-583. Doc. 47. The decision not to file a motion to preserve evidence is a matter of trial strategy. *State v. Lupardus*, 4th Dist. Washington No. 08CA31, 2008-Ohio-5960, ¶ 26-28. Further, under the third assignment of error, appellant failed to demonstrate (1) that the contents of Jarrod's phone that the State did not preserve constituted material exculpatory evidence or (2) that the State acted in bad faith in not preserving this potentially useful evidence. *Id*. at ¶ 29. Thus, the appellant cannot demonstrate how the outcome of the trial would have been different had his trial counsel chosen a different strategy.

**{¶44}** We now turn to the trial counsel's cross examination of the State's witnesses. The decision of the trial counsel not to cross examine the mother and sister of the victim was a tactical decision. "The extent and scope of cross-examination clearly fall within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 146. Further, appellant has not demonstrated how the decision of his trial counsel not to cross-examine several of the State's witnesses prejudiced him in a manner that deprived him of a fair trial.

*State v. Otte*, 74 Ohio St.3d 555, 565, 660 N.E.2d 711, 721 (1996) (holding "[t]rial counsel need not cross-examine every witness; indeed, doing so can backfire."). *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 216-217.

{¶45} We now consider the allegation that trial counsel failed to present an alternative theory as to the source of the fentanyl during cross-examination. We note that appellant does not, on appeal, present what alternative theory should have been presented by trial counsel. *State v. Howard*, 8th Dist. Cuyahoga No. 97695, 2012-Ohio-3459, ¶ 28-29. In the absence of evidence substantiating an alternate theory, appellant has not carried the burden of establishing how the outcome of his trial could have been different. After examining the record, we find that trial counsel's decision fell within what can be considered reasonable trial strategy. *State v. Brown*, 38 Ohio St.3d 305, 319, 528 N.E.2d 523 (1988) (holding "[i]t is also recognized that a defendant is not deprived of effective assistance of counsel when counsel chooses, for strategical reasons, not to pursue every possible trial tactic."). *See State v. Smith*, 4th Dist. Ross No. 09CA3128, 2011-Ohio-664, ¶ 30.

{¶46} In each of the alleged deficiencies that he points to on appeal, appellant has failed to establish that the outcome of his trial would have changed had his trial counsel acted differently. Thus, the appellant has not carried the burden of establishing an ineffective assistance of counsel claim. For this reason, the appellant's fourth assignment of error is overruled.

*Conclusion*

**{¶47}** Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Hancock County Court of Common Pleas is affirmed.

***Judgment Affirmed***

**ZIMMERMAN and SHAW, J.J., concur.**

**/hls**