[Cite as *State v. Green*, 2019-Ohio-1176.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                           Court of Appeals No. WD-18-029

　　　　　Appellee                                 Trial Court No. 2017CR0272

v.

Russell David Green                            **DECISION AND JUDGMENT**

　　　　　Appellant                              Decided:  March 29, 2019

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, David T.
Harold and James A. Hoppenjans, Assistant Prosecuting Attorneys,
for appellee.

Eric Allen Marks, for appellant.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} Appellant, Russell David Green, appeals from the March 28, 2018 judgment of the Wood County Court of Common Pleas convicting him of sexual battery, a violation of R.C. 2907.03(A)(5) and (B), and sentencing him to a term of 36 months of incarceration.  For the reasons which follow, we affirm.

**{¶ 2}** Appellant appeals asserting the following single assignment of error:

APPELLANT WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTIONS AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.

**{¶ 3}** The following evidence was admitted at trial. The victim testified she first met appellant when he was dating her mother in 2016 and the victim was 16 years old. A month later, he moved into the home of the victim's mother, the victim, and two other siblings, which was located across the street from the victim's grandparents, and contributed to the rent.

**{¶ 4}** In the beginning, the victim testified, she would not have characterized appellant as a father figure because she had a bad relationship with her biological father. But, over time, she began to think of him as a father figure. She believed appellant portrayed himself as a father figure by playing video games with her, giving her money, buying her food and clothing, taking care of household repairs, driving her if her mother was unavailable, and teaching the victim about things like cars and how to drive. While she recalled having called appellant "dad" a few times, she generally called him by his name and acknowledged that in a birthday card she had referred to him as "Bud."

**{¶ 5}** The victim further testified that one night in January 2017, appellant sent her a text from his bedroom telling about his pornographic dream about her. She became

2.

upset and went to her grandparent's home where her sister tried to calm her down. Her mother came looking for the victim and told her to stay with her grandparents. The victim believed her mother had a fight with appellant that night. Her mother asked him to leave, but he refused. The next day, appellant acted like nothing was wrong.

{¶ 6} After a while, appellant began touching her again, initially starting with hugging her or rubbing her back. He slapped her bottom once and she told him she did not like it. They would wrestle until it progressed to him touching her inappropriately. She would move away from him to make him stop, and he acted like he was not doing it on purpose. Although appellant had always told her she looked beautiful when she was dressed up to go out, he started making such comments daily. While appellant's suggestive comments disgusted the victim initially, she somehow, over time, felt closer to him. Appellant bought the victim a new phone and started messaging her and eventually started a sexual conversation.

{¶ 7} By March or April 2017, their relationship began to change. Just after the victim had turned 17 years of age, appellant came home while she was laying on the couch and started making out with her. He led her into the backroom where he eventually performed oral sex on her. After the family moved to Perrysburg, Ohio, they had sex 2-3 times a week while her mother was away. Appellant would leave the house and return after her mother left. The victim became very obsessed with appellant and thought she loved him. She promised him she would keep quiet about their relationship because he convinced the victim her mother would choose appellant over the victim. The

3.

victim had been close to her mother and did not want to lose her. But, she also kept quiet because she wanted appellant to marry her.

{¶ 8} In May 2017, her mother found the victim's diary which had an entry regarding her relationship with appellant and saw text messages on the victim's phone. Appellant told her mother the victim could not be believed because she was crazy and had mental issues.

{¶ 9} Initially, the victim did not want the police involved and denied that she had been manipulated by appellant because she thought she loved appellant. She admitted that she told the police the things her mother wanted her to say. However, during an examination by a Sexual Assault Nurse Examiner ("SANE"), the victim realized she had been manipulated and brainwashed. Over time, she came to realize she had not really consented to the sexual activity and that her mother had been right.

{¶ 10} An officer who was first approached by the mother alone testified the mother told the officer she believed the daughter had been having a sexual relationship with appellant, who was like a father to her. The mother indicated appellant had denied the accusations and accused the victim of being depressed or disturbed. The officer questioned the mother about appellant's role in the house and was told he did grocery shopping, laundry, helped with homework, etc., and if she was not at home, he was in charge.

{¶ 11} A second officer interviewed the mother and the victim separately. The mother told the officer she and her daughter had been living with appellant as a family,

4.

appellant played a role in discipline, and appellant and her daughter had a father/daughter relationship even though the mother retained the ultimate right to make decisions concerning the victim. The officer further testified the mother's testimony at trial was inconsistent with what she had told him initially.

{¶ 12} The victim indicated to the officer she had a good relationship with appellant and that he helped her with homework and purchased the cell phone for her. The victim also indicated that except for when appellant was unemployed for health reasons, he contributed to a joint bank account with her mother. The victim initially denied the sexual relationship and later indicated she had consented. The officer explained that she could not have consented if appellant was acting in loco parentis, but he did not explain the phrase to her. The officer met with the victim a second time to answer her questions as to why the police were still investigating.

{¶ 13} The text messages downloaded from the victim's phone were admitted into evidence. The officer did not find any messages on appellant's phone, but the messages on the victim's phone were consistent with her statements even though the evidence did not establish who sent the text messages. The social media messages from the victim's account were also admitted into evidence. In three separate social media messages, appellant referred to the victim as his daughter. The officer did not find any messages where the victim called appellant "dad" or "father."

{¶ 14} The SANE nurse testified she spoke with the mother alone. The mother stated she had met appellant online and he moved in with her very quickly. She further

indicated that appellant provided everything for them and was like a father to the victim. The mother had noticed the victim becoming clingy. The mother also indicated the victim has Asperger's Syndrome and ADHD. However, at trial the mother testified that the victim had been diagnosed with a mild form of Asperger's Syndrome, but was expected to grow out of it by late grade school.

{¶ 15} The nurse spoke to the victim alone and she indicated she initially thought of appellant like a father and was initially put off by his sexual comments. However, as he continued to text her, she accepted a sexual relationship with him. The nurse further testified that she explained to the victim how pedophiles groom children. The nurse wanted to relieve the victim's guilt about what happened and explain to her why her mother was upset with the victim. On cross-examination, the nurse further explained she had been trained to understand how pedophiles use grooming techniques and that she counseled the victim to give emotional support because the victim felt guilty for the tense dynamics between the victim and the mother. On redirect examination, the nurse further explained what grooming involves.

{¶ 16} A forensic investigator testified that an analysis of the rape kit samples indicated appellant as a contributor with a statistic of greater than 1 in 1 trillion.

{¶ 17} The victim's mother testified as follows. She and appellant had split up for a time in 2017, but they reconciled and she is currently engaged to him. When appellant and the mother first lived together, they had a joint account and paid the bills jointly. She purchased the victim's clothing out of the joint account. Appellant's name was on the

6.

lease. While the mother consulted with appellant about the victim, the mother believed she had sole authority over matters concerning the victim. Likewise, the mother testified, the victim refused to ask appellant's permission since he was not her father. The mother never saw appellant exert control over the victim. The victim was not close to her biological father. Although the mother wanted the victim and appellant to have a father/daughter relationship, it never developed. The mother believed appellant and the victim had a great relationship until she found the victim's diary. The mother explained that appellant had called the victim his daughter once on social media to encourage her as she took an exam. However, he never called her his daughter otherwise.

{¶ 18} When the mother confronted appellant about the diary, he did not deny the relationship. The mother explained the inconsistency of her statements as stemming from her later realization that everything was not as it had initially seemed and that the victim had not been honest. As a result, the mother sent the victim to live with her grandparents.

{¶ 19} In his sole assignment of error, appellant challenges that his trial counsel rendered ineffective assistance of counsel under both the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10, Ohio Constitution. He presents three alleged errors for our review.

{¶ 20} Appellant bears the burden of proving that his counsel was ineffective since an attorney is presumed competent. *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and *State v. Clinton,* 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 41. To establish a claim of ineffective assistance of appointed

7.

counsel under either the United States or Ohio Constitution, the defendant must show that his counsel's representation "fell below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus; *Strickland* at 687.

{¶ 21} While the reasonableness of the attorney's conduct must be considered in light of the facts of each case, reasoned tactical decisions generally cannot form the basis for a claim of ineffective assistance of counsel. *Strickland* at 689; *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 116. Generally, the scope of cross-examination is considered to be within the scope of debatable trial strategy. *Id.*; *State v. Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, ¶ 90. The fact that the strategy is not successful is irrelevant; the deficiency must have resulted in prejudice to the defendant by an unreliable or fundamentally unfair trial. *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995).

{¶ 22} We begin by addressing whether appellant's trial counsel substantially violated his duty to represent appellant.

{¶ 23} Appellant first argues his trial counsel was ineffective because his opening statements and cross-examination of the victim reveal a defense strategy of admitting a sexual relationship and contesting whether the victim believed appellant was acting "in loco parentis." Appellant asserts, this erroneous strategy caused trial counsel to focus on the victim's beliefs rather than the elements the state was required to prove, which was

8.

whether appellant voluntarily assumed the duties of a parent and supported the child. Furthermore, appellant asserts that his trial counsel's cross-examination was based on assumed facts contrary to appellant's interests, which actually brought out unsolicited testimonial evidence supporting the "in loco parentis" element.

{¶ 24} The elements of sexual battery offense alleged are: "engaging in sexual conduct with another, not the spouse of the offender when * * * [t]he offender is the * * * person in loco parentis of the other person." R.C. 2907.03(A)(5). This statute does not define the element of "in loco parentis" and, therefore, it must be given its common, ordinary, and usual meaning. *State v. Funk*, 10th Dist. Franklin No. 05AP-230, 2006-Ohio-2068, ¶ 55-56. Whether a person stands in loco parentis to a child is a question of fact the jury must determine. *State v. Butler*, 3d Dist. Defiance No. 4-11-13, 2012-Ohio-5022, ¶ 8, quoting *State v. Knepley*, 3d Dist. Henry No. 7-11-02, 2012-Ohio-406, ¶ 15, citing *State v. Caton*, 137 Ohio App.3d 742, 750, 739 N.E.2d 1176 (1st Dist.2000).

{¶ 25} The Ohio Supreme Court addressed the meaning of "in locos parentis" in *State v. Noggle*, 67 Ohio St.3d 31, 615 N.E.2d 1040 (1993), paragraph one of the syllabus (applying a prior version of the statute), *superseded by statute on other grounds as stated in State v. Mole*, 149 Ohio St.3d 215, 2016-Ohio-5124, 74 N.E.3d 368, ¶ 35-37 (the statute has been amended several times to expand the coverage to conduct by adults who had "special authoritative relationships with minors or other vulnerable populations" not covered by the first six enumerated types of offenders). The *Noggle* court noted that "R.C. 2907.03(A)(5) was quite obviously designed to be Ohio's criminal incest statute,"

9.

and the General Assembly has indicated its intent to expand the family unit to include more than biological parents and those with legal parental rights. *Id.* at 33. The court reasoned the term includes "a person who has assumed the dominant parental role and is relied upon by the child for support. * * * Simply put, the statute applies to the people the child goes home to." The court also noted that "[a] person 'in loco parentis' was grouped with guardians and custodians in the statute because they all have similar responsibilities." *Id.*

{¶ 26} Appellate courts have expanded upon the definition of the term. In *State v. Funk*, 10th Dist. Franklin No. 05AP-230, 2006-Ohio-2068, the court held "the assumption of the in loco parentis relationship is primarily a question of intention, which is shown by the 'acts, conduct and declaration of the person [allegedly standing] in that relationship.'" *Id.* at ¶ 71 (citations omitted). Support and maintenance are important indicators of such intent.

{¶ 27} The Tenth Appellate District has identified ten considerations for determining whether a person is acting in loco parentis: "(1) the person is charged with a parent's rights and responsibilities; (2) the person has assumed the same duties as a guardian or custodian; (3) the person has assumed a dominant parental role; (4) the child relies upon the person for support; (5) the child 'goes home' to the person; (6) the person's relationship with the child is close, supportive, and protective; (7) the person has the intention of acting as a parent, which is shown by the acts, conduct, and declaration of the person; (8) the person intentionally assumes the obligations incidental to the parental

10.

relationship; and (9) the person is the primary caretaker for the child while the biological parent is absent due to, for example, employment." *State v. Abubakar*, 10th Dist. Franklin No. 11AP-440, 2011-Ohio-6299, ¶ 13.

{¶ 28} In the case before us, appellant's trial counsel questioned the victim's perception of appellant as a father figure. We reject appellant's underlying argument that the victim's perception of the defendant as a father figure is irrelevant because that questioning on direct examination brought out testimony describing appellant's parental-like conduct. Cross-examination of the victim served to challenge the victim's credibility regarding appellant's conduct and also raised the question of whether appellant's conduct was parental or merely typical of someone who merely lives in a household as a boyfriend of the victim's parent.

{¶ 29} Admittedly, trial counsel did not control the victim's responses on cross-examination to prevent the victim from making additional statements beneficial to the prosecution. We also agree that trial counsel's questions assumed appellant helped prepare meals and had a joint account with the victim's mother, which elicited the victim's testimony that appellant pitched in with household meals and appellant made more money than the victim's mother. However, similar facts were also presented through the victim's direct testimony that her mother and appellant shared the rent payment and household expenses and that appellant had cooked some dinners. Furthermore, the cross-examination also elicited evidence that benefited appellant, such

as the fact that the victim had never referred to appellant as "dad" in her texts, social messages, or in a birthday card.

{¶ 30} Upon a review of the record, we conclude that trial counsel's focus on cross-examination of the victim was a matter of debatable trial strategy and did not constitute ineffective assistance of counsel.

{¶ 31} Second, appellant argues his trial counsel rendered ineffective assistance by failing to prevent the introduction of grooming evidence. Appellant asserts such "other acts" evidence were irrelevant under Evid.R. 401 because grooming is not an element of sexual battery. Both appellee and appellant raised the issue of whether appellant manipulated the victim in their opening statements. Furthermore, defense counsel inquired further into the issue of "grooming" during the cross-examination of the victim and the SANE nurse.

{¶ 32} The issue before us is not plain error, but ineffective assistance. We begin by determining whether trial counsel breached his duty to appellant by failing to object to and prevent the admission of grooming evidence in this case.

{¶ 33} Evidence of "other acts" of the defendant are not admissible at trial for the purpose of proving the defendant has a character trait and that he acted in the instant case in conformity with that character trait. Evid.R. 404(B); R.C. 2945.59. However, such evidence is admissible for a proper purpose, such as proving "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* This rule is to be strictly construed against admissibility. *State v. Conway*, 109 Ohio St.3d 412,

2006-Ohio-2815, 848 N.E.2d 810, ¶ 61, quoting *State v. Broom*, 40 Ohio St.3d 277, 533 N.E.2d 682 (1988), paragraph one of the syllabus.

{¶ 34} If the "other acts" evidence is alleged to be admissible for the purposes identified under Evid.R. 404(B) and noted above, the trial court must conduct a three-step analysis to determine if the "other acts" evidence should be admitted. *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 19-20. First, determine whether the "other acts" evidence makes a fact of consequence more or less probable? (Evid.R. 401). Second, determine whether the "other acts" evidence is presented for a legitimate purpose or only to prove the defendant acted in accordance with his character trait? (Evid.R. 404 (B)). Third, determine whether the "probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice." (Evid.R. 403). *Id*. at ¶ 20.

{¶ 35} The state argues that grooming evidence was relevant in this case as evidence of appellant's plan, scheme, motive and/or intent. We disagree. The cases cited by the state involved the issue of the identity of the perpetrator, which was proven by a common modus operandi utilized by the defendant regarding other victims. *See Williams* at ¶ 5; *State v. Horn*, 2018-Ohio-779, 108 N.E.3d 158, ¶ 23 (6th Dist.). In the case before us, the charge is sexual battery and at trial appellant did not deny the sexual relationship with the victim, but challenged that he was not acting "in loco parentis" to the victim at the time. The issue of grooming is not, therefore, probative of any fact the state was

13.

required to prove in this case and its admission served no legitimate purpose for the prosecution. We discuss prejudice from the admission of the grooming evidence below.

{¶ 36} As noted above, a particular line of cross-examination can be a debatable trial strategy. Although it would not be a debatable trial strategy to draw out irrelevant evidence, the cross-examination in this case regarding the issue of grooming did serve to challenge the victim's overall credibility by suggesting she was unduly influenced by the SANE nurse who had suggested grooming. Therefore, we find the cross-examination was a debatable trial strategy.

{¶ 37} Third, appellant contends his defense counsel rendered ineffective assistance because throughout the trial he failed to control the witnesses to limit their responses. Appellant points to the cross-examination of the police officer about the mother's testimony at trial which conflicted with her earlier statements to him as to the victim's credibility. Appellant asserts that in response to the open-ended question, the officer was permitted to testify that his view of the case had not changed and was based on the mother's initial reactions. Appellant asserts trial counsel should have questioned the mother further so she could have explained her change in testimony.

{¶ 38} Upon a review of the entire record, we find this cross-examination did not bring out any new evidence. Furthermore, the cross-examination allowed the mother the opportunity to explain she changed her opinion after living with the victim for the month following discovery of the relationship between the victim and appellant. Therefore, we find trial counsel's method of cross-examination was a matter of debatable trial strategy.

14.

{¶ 39} The second step in the analysis of whether trial counsel rendered ineffective assistance of counsel is to determine if any violation of the attorney's duty to his client resulted in material prejudice to appellant. *State v. Holloway*, 38 Ohio St.3d 239, 244, 527 N.E.2d 831 (1988).

{¶ 40} Upon a review of all of the evidence, we find appellant has failed to demonstrate such material prejudice. Appellant has failed to show the outcome of the trial would have been different without the evidence introduced through cross-examination because the same or similar evidence was also presented through direct examination of the witnesses.

{¶ 41} Furthermore, although there were references about manipulation and testimony was introduced regarding the concept of grooming, the prosecution also emphasized in its closing arguments that the issue of the victim's consent to the sexual acts was irrelevant. The prosecution explained the only issue was whether appellant committed the acts of sexual battery while in a position of "in loco parentis" to the victim when she was 16-17 years old. Likewise, the trial court instructed the jury to find the elements of the charged offense, which did not include the evidence of grooming. *See State v. Thomas*, 2d Dist. Montgomery No. 27362, 2018-Ohio-4345, ¶ 68. We presume the jury followed the jury instructions. *State v. Ireland*, Slip Opinion No. 2017-0344, 2018-Ohio-4494, ¶ 45.

{¶ 42} In this case there was overwhelming evidence of appellant's parental-like actions based on the testimony of the victim, her mother's prior statements, and the statements the victim made to the nurse and police, as well as appellant's social media

15.

messages referencing the victim as his daughter. Therefore, we cannot find that the outcome of the trial would have been different if the consent or grooming issue had not been raised and evidence relating to the victim's "consent" to the sexual conduct had been excluded.

{¶ 43} Finally, appellant argues the cumulative effect of his trial counsel's errors deprived appellant of a fair trial.

{¶ 44} The doctrine of cumulative error provides that "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64-65, 656 N.E.2d 623 (1995), citing *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus. In the case before us, this doctrine is not applicable because we did not find multiple instances of harmless error.

{¶ 45} Accordingly, we find appellant's sole assignment of error not well-taken.

{¶ 46} Having found that the trial court did not commit error prejudicial to appellant and that substantial justice has been done, the judgment of the Wood County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　JUDGE
Arlene Singer, J.　　　　　　　　　

Thomas J. Osowik, J.　　　　　　　　　_____
CONCUR.　　　　　　　　　　　　　　　　　　　　　　JUDGE

　　　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.