The STATE of Ohio, Appellee,

v.

ANAYA, Appellant.

[Cite as *State v. Anaya*, 191 Ohio App.3d 602, 2010-Ohio-6045.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L–10–1046.

Decided Dec. 10, 2010.

Julia R. Bates, Lucas County Prosecuting Attorney, and Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Kenneth J. Rexford, for appellant.

HANDWORK, Judge.

{¶ 1} This is the second time that this cause has been before the court on appeal from a judgment of the Lucas County Court of Common Pleas. See *State v. Anaya*, 6th Dist. No. L–06–1375, 2008-Ohio-1853, 2008 WL 1758882 ("*Anaya I*"). In that appeal, we affirmed appellant's conviction for murder in violation of R.C. 2903.02. Id. at ¶ 31. Subsequently, appellant filed a motion to "Correct Status of Void Sentencing Entry" in the trial court pursuant to *State v. Baker*, 119 Ohio St.3d 197, 2008-Ohio-3330, 893 N.E.2d 163, and Crim.R. 32(C). On February 5, 2010, the trial court entered a nunc pro tunc judgment entry that complied with *Baker* and Crim.R. 32(C). Anaya appeals that judgment and sets forth the following assignments of error:

{¶ 2} "I. Mr. Anaya was denied his right under the Ohio Constitution and the United States Constitution to Effective Assistance of Counsel, in that Counsel failed to adequately present to the jury the case for voluntary manslaughter.

{¶ 3} "II. Mr. Anaya was denied his right under the Ohio Constitution and the United States Constitution to Effective Assistance of Counsel, in that Counsel failed to find an independent forensic psychiatric expert to determine Danny's competency or sanity at the time of the offense.

{¶ 4} "III. Mr. Anaya was denied his right under the Ohio Constitution and the United States Constitution to Effective Assistance of Counsel, in that Counsel refused to enter a written plea by reason of insanity, as demanded by Mr. Anaya.

{¶ 5} "IV. Mr. Anaya was denied his right under the Ohio Constitution and the United States Constitution to Effective Assistance of Counsel, in that Counsel failed to handle the self defense in a reasonable manner, failed to properly investigate the DNA evidence, failed to request [Crim. R.] 16(B)(1)(g) discovery, and allowed a misleading instruction to the jury as to the voluntary manslaughter.

{¶ 6} "V. The trial court erred in its jury instruction as to voluntary manslaughter, by implying that the conviction must be for murder if the *mens rea* was purposeful and that the inferior degree murder offense of voluntary manslaughter applied only if the *mens rea* was knowingly and not purposeful.

{¶ 7} "VI. Mr. Anaya was denied his right under the Ohio Constitution and United States Constitution to counsel of choice, in that the Trial Court allowed the State of Ohio to unlawfully and without due process freeze the assets of Mr. Anaya, such that he could not retain counsel of his choice."

{¶ 8} The following facts, as set forth in *Anaya I* and agreed to by appellant, are pertinent to our disposition of appellant's assignments of error. We have also included additional pertinent facts as set forth in the record of this case.

{¶ 9} Appellant and his wife, Rhonda, were married for 19 years and had four children; however, only three of those children were residing with their parents at the time of the murder. Rhonda filed a complaint for divorce in July 2005. After she filed for divorce, Rhonda started sleeping on the family-room sofa. Appellant's three children, a 15–year–old girl, a 16–year–old girl, and a 14–year–old boy, each had an upstairs bedroom of his or her own. Those three children, who were in the family home when their mother was killed, testified at appellant's trial.

{¶ 10} The younger daughter related that on October 24, 2005, a Monday, she attended school, came home afterwards, and took a nap in her bedroom until 10:00 p.m. Upon awaking from her nap, the girl made herself a sandwich, ate it in her upstairs bedroom, and went to sleep around 11:00 p.m. Around 3:00 a.m. on October 25, 2005, the sounds of scratching and the front door's opening and closing woke her. Then she heard a muffled scream from downstairs. She got out of bed and went down to the family room, where the lights were on. There she saw Rhonda slouched half on and half off the couch; appellant was standing over her. The 15–year–old asked appellant, who she saw had blood "spattered" on his face, what was going on, and he told her that Rhonda had had a nightmare and had punched him. As appellant was telling her that nothing was wrong and to go back upstairs to bed, this daughter saw him put a knife in the back waistband of his jeans. She also saw that appellant had a pair of rubber gloves in the back pocket of his jeans and had work gloves on his hands.

{¶ 11} The girl also heard Rhonda asking appellant what he was doing and why he was wearing gloves. She recognized the long, wooden-handled knife from the kitchen, saying, "It almost looked like a machete * * * we always used it to cut watermelon." The girl returned to her bedroom and tried to call police but could not get a signal on her cell phone. She then heard Rhonda screaming, went to the stairway landing, leaned over, looked into the kitchen, and saw appellant stab Rhonda with the same knife three times. She also saw Rhonda with her hands up, trying to fend off the attack. The 15–year–old then ran back into her bedroom and was able to call 9-1-1 from her cell phone. A tape of the 9-1-1 call was submitted as evidence and played to the jury.

{¶ 12} Appellant's older daughter came home from school that day, ate a pizza with Rhonda, and went to her room between 9:30 and 10:00 p.m. She did not go to sleep and went downstairs to the kitchen around 2:25 a.m. for a drink. She saw Rhonda sleeping on the family-room couch and did not turn on any lights. The girl went back to her room, went to sleep, and according to her bedroom clock, woke up to the sound of screaming at 3:06 a.m. The older daughter heard appellant say, "Get back to bed" and thought he must be speaking to her brother, who, she assumed, was making the noise. Then she heard both Rhonda and appellant fighting, heard more screaming, and heard her younger sister go halfway down the stairs, scream, and run back into her bedroom.

{¶ 13} Soon thereafter, the noises stopped. The older girl then heard her brother ask appellant whether everything was all right and appellant telling the boy to go back to bed. She got dressed and went to her younger sister's room. The younger girl quickly told her older sister what she had seen and returned to speaking to the 9-1-1 dispatcher.

{¶ 14} At trial, appellant's son testified that when he went to his upstairs bedroom around 11:00 p.m., his mother was in the family room, and appellant was in his upstairs bedroom. The son later awoke to sounds of scratching and "people running around." Thinking it was the family dog, he stayed in bed. A few minutes later, he heard screaming, so he went downstairs. The boy stopped on the stairway landing as appellant was exiting the kitchen. He asked appellant what happened, and appellant told him to go back to bed. The son went back to his bedroom, but thinking that something was wrong, he went to his younger sister's bedroom. There, his younger sister told him that she saw appellant stabbing Rhonda and that she had called the police. The older sister was already in the room with his younger sister. At about the same time, the boy heard knocking on the front door. It was the police, who had just arrived in response to the 9-1-1 call.

{¶ 15} Sylvania Police Officers Crowell and Haase, the initial responders, testified to the condition of the scene as they found it. When appellant opened the door after they knocked, he was sweating heavily, had small cuts on his cheek, and had blood on his face. One officer told appellant they needed to talk, and appellant immediately responded, "She attacked me." The officers entered the front room, and Haase walked approximately ten feet straight back into the kitchen looking for appellant's wife while Crowell stood with appellant. When Haase saw Rhonda lying on the floor, he immediately told Crowell to handcuff appellant. When Crowell did so, he noticed blood on appellant's hands. He led appellant outside the home and placed him in the officers' patrol vehicle.

{¶ 16} Meanwhile, Haase called emergency medical services ("EMS") and without touching her, checked Rhonda for signs of life. In his opinion, she was

already dead. Rhonda had a large kitchen knife in her left hand. Nevertheless, in her testimony, the younger daughter testified that Rhonda was right-handed. Other officers were arriving at that point, and after securing the scene, Crowell and Haase went upstairs to sit with the three children.

{¶ 17} Officer Froelich, the EMS respondent, testified that he found no vital signs when he first arrived and checked Rhonda. He and his partner attempted to resuscitate her, but their efforts were unsuccessful. The coroner testified that among the multiple stab wounds that Rhonda suffered, at least two knife wounds—one in her neck and the other in her heart—were definitely fatal. Many of the knife wounds were "defensive" wounds, "inflicted on the person who attempts to defend him or herself."

{¶ 18} During his testimony on direct examination, appellant admitted that he had killed Rhonda, but he denied any plan or intention to kill her. He said that he had been awakened by voices outside the house around 3:00 a.m. Tuesday. He claimed that he fell asleep in multiple layers of clothing because he had bad knees and intended to use carpet cleaner he just purchased to clean his bedroom floor. According to appellant, he put on work gloves to deal with some garbage cans before he left for work and went outside to investigate the voices. He found no one, and when he came inside, Rhonda was sitting up on the sofa. The two began a conversation about holiday vacation time with the children. They began to argue, and Rhonda struck him in the face. They then began to struggle, but stopped when their younger daughter came down and turned on the lights.

{¶ 19} Appellant claimed that when he walked into the kitchen to check his face for injuries, Rhonda followed him and continued to argue. Rhonda grabbed a knife, and a struggle began, with both fighting over the knife. Appellant admitted that he stabbed Rhonda multiple times and admitted, in graphic detail, that he had caused each of her wounds. He acknowledged hearing his younger daughter say something and his son coming downstairs at one point. He also remembered putting the knife into Rhonda's hand afterwards, but claimed not to know whether she was dead at that point. Dazed, he then went upstairs and was changing his clothes when the police arrived. Appellant asserted that he had intended to call 9-1-1 but had not had time.

{¶ 20} The state argued that ample evidence supported a finding that appellant had a prior purpose and a plan to kill Rhonda. First, the state pointed to the unusual fact that appellant was wearing multiple layers of clothing and heavy work gloves at 3:00 a.m. and had two pairs of rubber gloves in his back pocket. Second, the younger daughter testified that appellant had had a knife in the family room when she saw him standing over Rhonda. Third, three days prior, appellant had purchased plastic gloves and carpet cleaner. The state contended that appellant had purchased these intending to clean the scene after he killed his

wife. Fourth, the interior of the trunk of appellant's company car had plastic sheeting covering it that was weighed down with a pair of shoes that appellant used for yard work. Appellant claimed not to know how or why the plastic sheeting was there. Fifth, a quilt had been placed on the kitchen table at some point that evening. The state maintained that appellant had placed the quilt there intending to carry Rhonda's body to the car.

{¶ 21} Appellant's attorney argued in closing that the physical evidence showed that the way appellant killed Rhonda demonstrated his lack of a plan or prior purpose to kill; that the killing occurred in a fit of sudden rage during a domestic fight; and that in sum, the evidence fit the definition of voluntary manslaughter. The trial court instructed the jury regarding aggravated murder and the lesser included offenses of murder and voluntary manslaughter. As stated infra, the jury found appellant guilty of murder.

■ {¶ 22} Prior to addressing any of appellant's assignments of error, we note that the state of Ohio asks this court to reconsider its decision in *State v. Mitchell*, 187 Ohio App.3d 315, 2010-Ohio-1766, 931 N.E.2d 1157 (*"Mitchell II"*), and find that the trial court's failure to state the basis, e.g., that the defendant was found guilty by a jury, in appellant's conviction is merely a clerical error that was corrected by the lower court's nunc pro tunc entry on sentencing. Thus, the state argues that the appeal of the nunc pro tunc sentence in this case is barred by waiver, res judicata, and/or collateral estoppel.

{¶ 23} In *Mitchell II*, which was first decided by the trial court in 2007, the defendant entered a plea of no contest, was found guilty, and was sentenced. The judgment on sentencing contained the phrase, "[The] defendant has been convicted of Trafficking in Cocaine * * *." (Emphasis omitted.) Id. at ¶ 2, citing *State v. Mitchell*, 6th Dist. No. L–07–1092, 2007-Ohio-5316, 2007 WL 2874351 (*"Mitchell I"*). After the Ohio Supreme Court rendered its decision in *State v. Baker*, 119 Ohio St.3d 197, 2008-Ohio-3330, 893 N.E.2d 163, the trial court entered a "corrected judgment of conviction." *Mitchell II* at ¶ 3. The defendant appealed that judgment to this court. Id. at ¶ 1. The state of Ohio filed a motion to dismiss the appeal, asserting that it was barred by the doctrines of res judicata, waiver, and collateral estoppel. Id. at ¶ 10. This court determined, however, that in light of the Ohio Supreme Court's decision in *Baker*, the original judgment in *Mitchell I* was not a final order under Crim.R. 32(C); thus, we decided that the doctrines of waiver, collateral estoppel, and res judicata were inapplicable. Id. at ¶ 15 and 17. We also rejected the state's claim that we had jurisdiction over *Mitchell I* because the original judgment was not void, but voidable. Id. at ¶ 18. We therefore denied the prosecution's motion to dismiss. Id. See also *State v. Tuggle*, 6th Dist. No. L–09–1317, 2010-Ohio-4162, 2010 WL 3449245; *State v. Lampkin*, 6th Dist. No. L–09–1270, 2010-Ohio-1971, 2010 WL

1781496. Based upon the foregoing, we hereby decline to revisit our decision in *Mitchell II* and shall address the merits of appellant's assignments of error.

{¶ 24} Appellant's assignments of error Nos. I, II, III, and IV complain, albeit for different reasons, that he was deprived of effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution. In *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, the United States Supreme Court set forth a two-part test to determine ineffective assistance of counsel. Id. at 687.

{¶ 25} To demonstrate ineffective assistance of counsel, appellant must satisfy two prongs. Id. First, he must demonstrate that trial counsel's conduct fell below an objective standard of reasonableness. *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052, 80 L.Ed.2d 674. Second, he must show that the errors were serious enough to create a reasonable probability that but for the errors, the result of the trial would have been different. Id.; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373. The failure to prove either prong of the test makes it unnecessary for a court to consider the other prong. *State v. Madrigal* (2000), 87 Ohio St.3d 378, 389, 721 N.E.2d 52, citing *Strickland* at 697. Finally, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland* at 688.

{¶ 26} Voluntary manslaughter is an inferior degree of murder. *State v. Shane* (1992), 63 Ohio St.3d 630, 632, 590 N.E.2d 272. The elements of voluntary manslaughter follow: "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *." R.C. 2903.03(A). Appellant argues that his trial counsel breached his duty to his client by failing to adduce the facts at trial that related to his "emotional and mental anguish" and to the provocation that caused him to repeatedly stab his wife.

{¶ 27} As we pointed out in our previous decision, appellant's trial counsel used DNA evidence, the chronology leading to the stabbing, the pattern of the knife wounds, and the circumstances surrounding the parties' divorce to support the argument that it was Rhonda who had initiated the physical struggle and provoked appellant to use deadly force. Furthermore, defense counsel did request an instruction on voluntary manslaughter, which was given to the jury. Thus, due to the evidence offered against appellant, we find that the strategy employed by appellant's trial counsel was reasonable. Appellant's assignment of error No. I is found to be without merit.

■ {¶ 28} In his assignment of error No. II, Anaya argues that trial counsel was ineffective because he "failed to locate an independent psychologist who could perform a forensic evaluation to determine [appellant's] competency and sanity at the time of the murder."

{¶ 29} Prior to trial, appellant was examined by two psychiatrists, Dr. Thomas Sherman and Dr. Mark Fetterman. In addition, Anaya was referred to the Court Diagnostic and Treatment Center, where he was examined by Charlene A. Cassel, a psychologist. Dr. Cassel rendered the following opinion:

{¶ 30} "Based upon my examination of Mr. Anaya, I am of the opinion that he is malingering. He is faking mental illness as a way of avoiding the consequences of his current position with the court. It is my opinion to a reasonable degree of psychological certainty that Mr. Anaya is able to understand the nature and objectives of the proceedings against him and to assist his attorney in his defense. * * * I am of the opinion that any lack of cooperation or inability to proceed is the result of malingering."

{¶ 31} In his report, Dr. Sherman indicated that it appeared that appellant was making a "purposeful attempt to make himself 'look' mentally ill." Dr. Sherman concluded that he could not make a diagnosis as to appellant's competence to stand trial and recommended that Anaya be observed in a forensic inpatient unit.

{¶ 32} Appellant was, therefore, admitted as an inpatient at Twin Valley Behavioral Healthcare for a competency-to-stand-trial evaluation and a sanity evaluation. In his report, Dr. Mark S. Fetterman, who is the psychiatrist who examined appellant at that facility, was of the opinion to "a reasonable degree of medical certainty that Mr. Danny Anaya has no mental illness and understands the nature and object of the legal proceedings against him and has the ability to assist in his defense if he chooses. He may choose not to cooperate because he is acting as if he is mentally ill because he feels that this will either delay his trial or win his freedom in some manner he is hoping for."

{¶ 33} Because appellant was evaluated by three different experts who concluded that he was not suffering from any mental illness, we find that there was no reasonable probability that yet another expert evaluation would have changed the outcome in the case before us. See State v. Johnson, 1st Dist. No. C–030643, 2004-Ohio-3624, 2004 WL 1531939, ¶ 20–21. Therefore, trial counsel did not fail in any duty to his client by not seeking yet another psychiatric expert, and appellant's assignment of error No. II is not well taken.

■ {¶ 34} Appellant's assignment of error No. III urges that his trial counsel was ineffective by failing to enter a written plea of not guilty by reason of insanity. In circumstances that indicate that entering a plea of not guilty by reason of insanity would be unsuccessful, appointed counsel's decision not to enter

that plea is not unreasonable. See *State v. Robinson,* 6th Dist. No. L–03–1307, 2005-Ohio-5266, 2005 WL 2416110, ¶ 33. Here, all three experts agreed that appellant was feigning mental illness. Consequently, counsel could reasonably decide not to enter a not-guilty-by-reason-of-insanity plea. Appellant's assignment of error No. III is not well taken.

{¶ 35} In assignment of error No. IV, Anaya argues that trial counsel was ineffective by (1) failing to request an instruction on self-defense or to make a case for self-defense in his closing argument, (2) failing to properly investigate the DNA evidence, (3) failing to request Crim.R. 16(B)(1)(g) discovery, and (4) allowing a misleading instruction to the jury as to voluntary manslaughter.

{¶ 36} In the present case, Cynthia Bessier, M.D., a deputy coroner and forensic pathologist, testified that Rhonda died of multiple stab wounds, with at least two of those wounds—one in the neck and the other in the heart—classified as fatal in and of themselves. The victim also had a number of defensive knife wounds on her hands. The only "wounds" suffered by appellant were some scratches on his face. After all of the evidence was placed before the jury, the trial court provided the parties with a set of jury instructions that included an instruction on self-defense. Nonetheless, appellant's trial counsel, after conferring with his client, decided not to request the instruction on self-defense.

{¶ 37} Self-defense is an affirmative defense. *State v. Jackson* (1986), 22 Ohio St.3d 281, 283, 22 OBR 452, 490 N.E.2d 893. In order to raise this defense, appellant was required to prove, by a preponderance of the evidence, that (1) he did not create the situation giving rise to the fight, (2) he "had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force," and (3) he did not "violate any duty to retreat or avoid the danger." *State v. Gillespie,* 172 Ohio App.3d 304, 308, 2007-Ohio-3439, 874 N.E.2d 870, ¶ 12. Moreover, this defense was not available to appellant unless he demonstrated that the force he used "to repel the danger was not more than the situation reasonably demanded." *State v. Johnson,* 6th Dist. No. L–08–1325, 2009-Ohio-3500, 2009 WL 2096286, ¶ 12. Thus, if appellant used a greater degree of force than was necessary under the circumstances, his actions were not justifiable on the ground of self-defense. Id., citing *State v. McLeod* (1948), 82 Ohio App. 155, 157, 37 O.O. 522, 80 N.E.2d 699.

{¶ 38} We shall assume the truth of appellant's testimony wherein he stated that it was Rhonda who took the large knife out of a kitchen drawer and threatened him. Nonetheless, his subsequent action in taking this knife and stabbing his wife multiple times with greater force than necessary under the

circumstances rendered any claim of self-defense unjustifiable. Consequently, we conclude that appellant's trial counsel was not ineffective in this regard.

{¶ 39} Appellant next claims that defense counsel was ineffective because he failed to request DNA testing of the blood that was found on the sofa because such testing would have supported his testimony that his wife attacked him when she was on the sofa. Assuming for the sake of argument that it would have shown that Rhonda had initiated the physical fight, this would be relevant to a claim of self-defense, which we have already determined was unjustifiable.

{¶ 40} Finally, appellant argues that his defense counsel was ineffective because he failed to engage in Crim.R. 16(B)(1)(g) discovery for the purpose of cross-examining witnesses "who were known to have made prior statements" and any evidence possessed by the state. Appellant fails to identify any of the witnesses who had made prior statements or any evidence that the state should have, but did not, produce. Consequently, appellant cannot demonstrate that there was a reasonable probability that the outcome of his trial would have been different absent trial counsel's alleged error. *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 41} For all of the foregoing reasons, appellant's assignment of error No. IV is not well taken.

{¶ 42} Appellant's assignment of error No. V maintains that the trial court's jury instruction on the lesser offense of involuntary manslaughter was in error. In particular, he maintains that as applicable to this case, the jury should have been instructed that the "[s]tate's proof of the element of purpose as to the Murder charge was sufficient proof of knowingly for the voluntary manslaughter case."

{¶ 43} We start with the proposition that appellant failed to object to the instruction on voluntary manslaughter; therefore, the jury instructions can be reviewed only for plain error under Crim.R. 52. *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804. An erroneous jury instruction does not amount to plain error unless, but for the error, the result of the trial clearly would have been different. Id. An appellate court views jury instructions in the context of the overall charge rather than in isolation. *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 126. Here, considering the jury instructions as a whole, we conclude that the trial court provided the jury with the correct legal information on offenses of murder and involuntary manslaughter.

{¶ 44} The transcript of appellant's trial reveals that the trial court informed the jury that it could not find defendant guilty of murder unless it concluded that defendant purposely killed Rhonda. The trial court defined "purposely" by explaining: "A person acts purposely when it is his specific intention to cause a

certain result." This definition comports with the definition of "purposely" in R.C. 2921.22(A). The court further instructed that to act purposely is to do "it intentionally and not accidentally." The court below then correctly made a distinction between voluntary manslaughter and murder by stating that voluntary manslaughter "is distinguished from murder by the failure to prove that the death was purposely caused and by the presence of certain mitigating circumstances." The court specifically referred to the mitigating circumstance of "sudden passion" or "sudden fit of rage" on the part of appellant brought about by serious provocation on the part of the victim that was "reasonably sufficient to incite the defendant into using deadly force."

{¶ 45} The court then informed the jury that an individual "acts knowingly, regardless of this purpose, when he is aware that his conduct will probably cause a certain result. A person has knowledge of circumstances when he is aware that such circumstances probably exist." This language tracks the meaning of "knowingly" found in R.C. 2901.22(B). Therefore, it is clear that the mens rea necessary for the commission of murder does not subsume the mens rea necessary for the commission of voluntary manslaughter. As a result, we find that the trial court did not commit any error, much less plain error, in its instructions to the jury on the meaning of either of these terms. Appellant's assignment of error No. V is not well taken.

{¶ 46} In assignment of error No. VI, Anaya contends that the trial court violated his right to due process by freezing his assets, thereby depriving him of his right to engage counsel of his choice as protected under the United States and Ohio Constitutions. According to appellant, the amount "frozen" was $1,775.10 and three gold rings. He asks this court to order the common pleas court to give Anaya these items so that he may hire an attorney, and, apparently due to the alleged constitutional violations, to order a new trial.

{¶ 47} Appellant filed a motion for the release of evidence on January 12, 2006. In this motion, Anaya listed ten items, including cash found "in pants pockets" and three gold rings. The trial court denied this motion on January 26, 2006. Appellant's January 12, 2006 motion fails to identify any of the items listed in the motion as the property of appellant. Therefore, we cannot say that the trial court erred in denying this motion, and appellant's assignment of error No. VI is not well taken.

{¶ 48} The judgment of the Lucas County Court of Common Pleas is affirmed.

Judgment affirmed.

PIETRYKOWSKI and COSME, JJ., concur.