[Cite as *State v. Ruetz*, 2023-Ohio-398.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WILLIAMS COUNTY

State of Ohio                                               Court of Appeals No.  WM-22-001

       Appellee                                        Trial Court No.  20CR000205

v.

David L. Ruetz                                         **DECISION AND JUDGMENT**

       Appellant                                       Decided:  February 10, 2023

* * * * *

Katherine J. Zartman, Williams County
Prosecuting Attorney, for appellee.

Karin L. Coble, for appellant.

* * * * *

**ZMUDA, J.**

{¶ 1} This matter is before the court on appeal of the judgment of the Williams

County Court of Common Pleas, sentencing appellant, David L. Ruetz, to an aggregate

prison term of 58 months, after a jury found him guilty of unlawful possession of a

dangerous ordnance and inducing panic with a gun specification.  For the reasons that follow, we affirm.

## I.  Facts and Procedural History

{¶ 2} On November 17, 2020, appellant was taken into custody as he sat on the sidewalk between the municipal court building and a daycare, holding a sawed-off shotgun and making comments that he would 'be in the news' and it 'was a good day to die.'  The court and daycare each initiated lock-down procedures and, initially, officers attempted to convince appellant to surrender, but eventually used a taser to subdue and disarm him.  Once in custody, appellant expressed his desire to die and his disappointment that officers had not shot him in response to his conduct on the sidewalk.

{¶ 3} The state of Ohio charged appellant with possession of a dangerous ordnance in violation of R.C. 2923.17(A) and inducing panic in violation of R.C. 2917.31(A)(3) and (C)(1)(4)(a), each a felony of the fifth degree.  The indictment included a three-year firearm specification, attached to the inducing panic charge.

{¶ 4} At his first court appearance, appellant disputed that his muzzleloader was a firearm, informing the trial court it is "a black powder muzzleloader, it's not a firearm." Appellant initially entered a plea of not guilty by reason of insanity.  After examination by court diagnostics and a hearing, the trial court found him competent, appellant withdrew his insanity plea, and he entered a not guilty plea to both charges.  He sought a change of venue for his trial, citing the publicity, which the trial court denied.

2.

**{¶ 5}** In the months leading up to trial, appellant fired his first court-appointed counsel, the trial court appointed new counsel, and appellant requested time to hire his own attorney to replace his second court-appointed counsel. After he failed to raise sufficient funds to hire his own attorney, and after more than a year held in custody, the trial court appointed a third attorney and the matter proceeded to trial on February 28-March 1, 2022.

**{¶ 6}** The testimony at trial demonstrated the following:

**{¶ 7}** The city of Bryan fire chief, Bruce Siders, was the first to approach appellant as he walked toward the municipal court building, which housed several city offices. He noticed appellant on the ground, and noted appellant had a prosthetic leg. Believing appellant had fallen on the sidewalk, he asked appellant if he needed help. In response, appellant cautioned Siders, "you don't want any part of this." Chief Siders then saw the firearm in appellant's hands and backed away. Siders testified that the firearm "looked like a homemade sawed off shotgun."

**{¶ 8}** Chief Siders entered the courthouse and notified the bailiff of the situation, then made sure the offices inside the building had initiated lockdown procedures. Siders contacted his office and gave the order to deploy the department's engines to block traffic, creating a perimeter around the courthouse. Based on the deployment of fire department personnel and resources for approximately one hour, Siders testified that his office incurred expenses in responding to appellant's conduct in the amount of $357.61.

3.

{¶ 9} Dennis Manley, the Bryan Municipal Court security officer, noticed appellant as he approached and sat down on the sidewalk. He saw something in appellant's hands and testified that appellant "just sat down and then stared at the door," which Manley deemed suspicious. Because Manley recognized appellant, he called appellant's probation officer, who worked inside the building, and asked the probation officer to watch him.

{¶ 10} Soon after, Chief Siders entered the building and informed Manley that appellant had a gun, prompting Manley to lock the building down, move the people inside to safety, and secure the doors. Manley testified that the building housed the court, the prosecutor's office, the city engineer and mayor, the parks and recreation department, the city clerk, the probation department, and the health department. After securing the building, Manley attempted to observe the scene outside. From the second floor of the building, Manley used binoculars to view events, and he recognized appellant's firearm as a "sawed off gun of some type." He believed it was an "inline muzzleloader of some type." Manley testified that he did not participate in confronting appellant, but focused on keeping the people inside his building calm and safe.

{¶ 11} The city clerk/treasurer for the city of Bryan, Laura Rode, was working in her office when she heard a page on the phone intercom system, alerting personnel of a gunman outside the building. Rode supervised nine in her office, and pursuant to the city's active shooter training and protocol, she accounted for her staff, checked for citizens in her area, and initiated lockdown procedures. Rode and her staff moved away

4.

from the windows after closing the blinds and they turned off the lights, sheltering in place for about an hour. Based on the cessation of business in her own office and other city offices during that period of lockdown, Rode calculated the dollar amount of work lost at about $1,177.00.

{¶ 12} In addition to lockdown procedures, first responders reported to the scene from several agencies: Bryan police department, Williams County sheriff's department, state highway patrol, the fire department, and EMS. On the date of the incident, Officer Christopher Chapa was the chief of police for the city of Bryan. Chapa testified that he responded to a call regarding a person with a gun outside the municipal court. He was advised that two officers were already at the scene. He arrived and entered the courthouse, and immediately notified the judge of the situation. Chapa then spoke with a probation officer, who explained that appellant was unhappy and having legal and marital problems.

{¶ 13} With that information, Chapa exited the building, approached appellant, and "[asked] him what's going on?" Appellant informed Chapa that "he's here to get me some headlines" and added "it was a good day to die." Chapa testified that appellant was holding the gun in his hands the entire time, and it looked like "an old, junk piece of gun." After speaking with appellant and trying to persuade him to surrender his weapon, Chapa believed appellant was suicidal, and that appellant "wanted me to shoot him."

{¶ 14} Chapa returned to the courthouse and radioed to one of the officers on scene, Officer Tracy Williamson, to instruct her to "switch over to her taser." Chapa also

5.

called for a hostage negotiator, but learned it would take a negotiator at least 20 minutes to arrive at the scene. Chapa returned to appellant, and while Officer Derek Beardsley kept a rifle trained on appellant, Chapa resumed speaking with him in the hopes appellant would surrender. As Chapa kept appellant's attention, Officer Williamson approached from the rear with the taser, and once in range, "she tased him and he went down." Officer Beardsley secured appellant's firearm, and the weapon was ultimately sent for testing.

{¶ 15} Officer Tracy Williamson's account was consistent with Chapa's testimony. Williamson arrived on scene with her rifle, based on reports that appellant had a sawed-off shotgun, "a more powerful weapon" that required officers to "match the amount of force" in response. She and other officers provided cover for Chapa as he spoke with appellant, unarmed. Williamson observed appellant, and realized he was watching everyone in the reflection from the courthouse windows and could see the officers' movement behind him. After Chapa reentered the courthouse, he contacted her on her radio and authorized her to use the larger of the police tasers. Williamson signaled to the other officers that she was switching to her taser and also that appellant was "watching in the glass."

{¶ 16} Once Williamson was within range, she deployed the taser, incapacitating appellant. She then photographed appellant's back, to record the placement of the taser darts in his back, "which were pretty textbook where they landed[.]" She indicated that Beardsley secured the weapon while appellant received medical attention. Williamson

6.

photographed Beardsley as he disassembled and packaged the firearm as evidence. The cost incurred in responding to appellant's actions, Williamson testified, was itemized in a bill she submitted for the prosecution, totaling $919.60.

{¶ 17} As to appellant's weapon, Williamson described the firearm used by appellant as:

> [A] muzzleloader, fifty caliber muzzleloader. It's taped up with something, almost looks like something you wrap a bat or something with, a baseball bat.
>
> * * *
>
> [Y]ou can see where it's sawed off on the end so the barrel's really only about that much. And I'm not a muzzle, I'm not a shooter of muzzleloaders so [Officer Beardsley] can better explain this. But all the mechanisms are there. It was, BCI test fired it and said it was capable.

{¶ 18} Officer Derek Beardsley, who took custody of the weapon and made it safe for transport, provided a more detailed description of the firearm, as follows:

> I knew it to be an eclipse CVA muzzleloader, a sawed off. And I could see the primer in it at that time and then once I got the firearm away from him and he was in custody, I took the primer out of the firearm to make it safe.
>
> * * *

With the muzzleloader you got to load from the barrel. You take the powder pellets, you put the pellets down in the barrel. Then you take the bullet and you then put the bullet down after you put the powder in. And then to fire the firearm, you need a primer in the breach plug. You put the primer in the breach plug and then it's ready to fire essentially.

Once appellant was in custody, Officer Beardsley placed appellant's firearm in a package to send it for testing.

{¶ 19} Kevin Kramer, a forensic scientist for the Ohio Bureau of Criminal Investigation (BCI) performed that testing. Kramer examined the firearm and testified as follows:

This weapon is a muzzleloader. So the way that it works is that in order to load this weapon, gun powder either loose powder is measured and poured into the barrel or pelletized power can also be placed into the barrel using a ram rod to push it down in the barrel. Your projectile or bullet is then pushed in next. On the inside of the firearm is what's called a breach plug and basically this provides an opening that leads to where the gun powder is. You place a primer on that breach plug. That primer contains a shock sensitive substance so when it's struck it's going to create a spark which will ignite the gunpowder, that powder is going to rapidly convert from a solid to a gas kind of like a tiny explosion, and it is these expanding gases that will push the bullet down the barrel and down range.

8.

{¶ 20} Kramer indicated that, because the firearm was modified, with a missing stock and a shortened barrel, he tested the operability of the muzzleloader by placing a primer in the breach plug and discharging the weapon without gun powder or a projectile, according to safety protocol. Kramer performed this test twice, and each time the muzzleloader fired. He did not test with the powder, primer, or projectile that appellant had loaded in the muzzleloader, for safety reasons.

{¶ 21} In sum, the state's witnesses testified that appellant caused alarm by sitting outside the courthouse with a sawed-off muzzleloader, and personnel responded from several agencies, incurring expense to the city exceeding $1,000.00. First responders placed the court and nearby daycare into lockdown and used personnel and resources to barricade the area to control the scene. Staff inside the courthouse implemented their active shooter protocols, with people sheltering in place until police took appellant into custody and finished securing the scene.

{¶ 22} The defense did not challenge evidence that demonstrated appellant held a sawed-off muzzleloader, but instead, attempted to demonstrate the muzzleloader did not meet the legal requirement to be deemed a firearm. Trial counsel attempted to elicit such testimony from the expert, Kramer, who declined to state a legal conclusion. Trial counsel also, initially, characterized the muzzleloader as a percussion cap, black powder muzzleloader, but after the state introduced contrary evidence of a primer ignition system that used pelletized powder, the defense elicited no testimony to support appellant's

9.

theory of an obsolete firearm. At the close of the state's case, the defense presented no witnesses.

{¶ 23} Pertinent to this appeal, the argument to the jury focused on whether appellant's muzzleloader met the legal requirements for a firearm for purposes of the dangerous ordnance charge and the firearm specification. The prosecution argued that the evidence demonstrated appellant possessed a dangerous ordnance, because the muzzleloader is a sawed-off shotgun, and was capable of firing and causing death. The defense, however, argued that the muzzleloader "is a primitive weapon and not a firearm." There was no testimony regarding a primitive weapon.

{¶ 24} In instructing the jury, the trial court provided the following definitions to guide deliberations:

The Defendant is charged with unlawful possession of a dangerous ordnance. Before you can find him guilty, you must find beyond a reasonable doubt that on or about the 17th day of November or 2020, and in Williams County, Ohio, the Defendant knowingly acquired, had, carried or used any dangerous ordnance, to wit: a sawed off hand held 50 caliber muzzleloader.

* * *

The definition of dangerous ordnance. Dangerous ordnance means any of the following: Number One – Any automatic or sawed-off firearm; Number Two – Any firearm, and Number Three – Any combination of

10.

parts that is intended by the owner for use in converting any firearm or other device into a dangerous ordnance.

Appellant's trial counsel did not object to the jury instructions.

{¶ 25} After deliberating, the jury found appellant guilty of possessing a dangerous ordnance and inducing panic, and determined appellant used, displayed, or brandished a firearm in committing the offense of inducing panic. On April 4, 2022, the trial court imposed a prison term of 11 months as to possession of a dangerous ordnance and a prison term of 11 months as to inducing panic, with an additional, consecutive prison term of 3 years for the attendant firearm specification. The trial court ordered the two, 11-month prison terms to be served consecutively, after the mandatory 3-year term for the firearm specification, for an aggregate prison sentence of 58 months.

{¶ 26} Appellant filed a timely appeal.

## II. Assignments of Error

{¶ 27} Appellant now challenges his conviction, arguing the following as error:

1. The offense of unlawful possession of a dangerous ordnance is unsupported by sufficient evidence and is therefore a violation of Mr. Ruetz' right to Due Process granted by both the U.S. Constitution and the Ohio Constitution.

2. Plain error occurred because the jury instructions failed to correctly define "dangerous ordnance."

11.

3. Defense counsel rendered ineffective assistance by failing to argue that the muzzle-loader had an obsolete ignition system and was therefore an exception to the definition of dangerous ordnance, and by failing to object to the incorrect jury instructions.

4. If the conviction for possession of a dangerous ordnance is unsupported by sufficient evidence and vacated, then the conviction for inducing panic is also legally insufficient and also must be vacated.

5. Insufficient evidence was presented that Mr. Ruetz intended to cause panic or that he recklessly disregarded a likelihood of serious public inconvenience or alarm.

{¶ 28} For ease of discussion, we address some assignments of error together.

### III. Analysis

{¶ 29} In his first three assignments of error, appellant challenges the conviction for possession of a dangerous ordnance, arguing insufficient evidence and arguing his trial counsel was ineffective by failing to argue the weapon fell within an exception to the definition of dangerous ordnance and by failing to object to the trial court's definition included within the jury instructions. Appellant also argues the trial court committed plain error in providing an incorrect jury instruction regarding the definition for "dangerous ordnance."

{¶ 30} In his fourth and fifth assignments of error, appellant challenges his conviction for inducing panic. He argues that, without sufficient evidence of a dangerous

12.

ordnance, there was insufficient evidence to support conviction for the offense. Additionally, appellant argues there was insufficient evidence to support a finding that appellant intended to cause panic or recklessly disregarded the likelihood of serious public inconvenience or alarm.

## A. Standards of Review

{¶ 31} Appellant challenges the sufficiency of the evidence to support conviction as to both charges. We review each conviction by construing the evidence most favorably for the prosecution to determine whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Smith,* 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). To pass the test of sufficiency, the evidence must be adequate to sustain the verdict. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). A sufficiency review presents only a question of law, with credibility determinations regarding the evidence not part of that review. *Thompkins* at 386; *State v. Yarbrough,* 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79.

{¶ 32} Appellant also argues his trial counsel was ineffective because he did not argue or pursue the theory that his muzzleloader fell within an exception to the definition of dangerous ordnance, and failed to object the trial court's jury instructions regarding that definition. We employ a two-step process in considering whether trial counsel rendered ineffective assistance. (Citation omitted) *State v. Bradley,* 42 Ohio St.3d 136, 141, 538 N.E.2d 373 (1989). "First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client.

13.

Next, and analytically separate from the question of whether the defendant's Sixth Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness." * * *." *Id.* at 141-142, citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶ 33} In reviewing trial counsel's performance, we presume "counsel's performance falls within the wide range of reasonable professional assistance[.]" *Id.* at 142, quoting *Strickland* at 687-688. Applying a "highly deferential" scrutiny, we will not find ineffective assistance "unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." *Id.,* citing *Strickland* at 689.

{¶ 34} Finally, appellant argues that the trial court committed plain error in providing an incorrect definition of dangerous ordnance as part of the jury instructions. Because he failed to object to the jury instructions, we may review only for plain error under Crim.R. 52. *State v. Anaya,* 191 Ohio App.3d 602, 2010-Ohio-6045, 947 N.E.2d 212, ¶ 43 (6th Dist.), citing *State v. Long,* 53 Ohio St.2d 91, 96-97, 372 N.E.2d 804 (1978). We review a jury instruction "in the context of the overall charge." (Citation omitted) *State v. Diar,* 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 126. To constitute plain error, an improper jury instruction must have affected the outcome of the trial, with reversal limited to exceptional circumstances that require a finding of plain error to "prevent a manifest miscarriage of justice." *Long* at 97.

14.

**{¶ 35}** We address the assigned errors in turn. [1]

**B. Dangerous Ordnance**

**{¶ 36}** The jury found appellant guilty of having a dangerous ordnance, in violation of R.C. 2923.17(A), requiring proof that he knowingly acquired, had, carried, or used any dangerous ordnance, in this case identified as a sawed-off firearm. Appellant's first three assignments of error challenge the conviction, arguing a lack of sufficient evidence, an incorrect definition of "dangerous ordnance" within the jury instruction, and ineffective assistance of trial counsel based on failure to argue an exception as an obsolete weapon and failure to object to the jury instructions.

### 1. The state presented sufficient evidence of a dangerous ordnance

**{¶ 37}** In his first assignment of error, appellant argues insufficient evidence, based on his belief that his muzzleloader is an obsolete weapon and exempted from the definition of "dangerous ordnance." In prosecuting its case, the state proceeded on the theory that the sawed-off shotgun possessed by appellant satisfied the element of "dangerous ordnance." Pursuant to R.C. 2923.11(K), a "sawed-off firearm" is "dangerous ordnance."

**{¶ 38}** At trial, defense counsel argued that "a black powder muzzleloader with a precision [sic] cap is *not a firearm*" and therefore appellant could not be guilty of

---

[1] Appellant also includes argument regarding the recently enacted open carry law and his mental health issues, without including an assignment of error as to either argument. We limit our analysis to the issues raised in each assignment of error, as provided by App.R. 12(A)(2).

15.

possessing dangerous ordnance "because a black powder muzzleloader *is not a firearm* and does not meet the definition of a dangerous ordnance." Counsel also argued that appellant's muzzleloader is a "primitive weapon" and did not meet the legal definition of "*firearm*." At trial, appellant attempted to negate the state's characterization of his muzzleloader as a "firearm" through argument, without supporting evidence. On appeal, he argues his muzzleloader *is* a firearm, but it is excepted from the definition of "dangerous ordnance" because it is an obsolete firearm.

{¶ 39} "The difficulty in analyzing whether a specific instrument constitutes a 'dangerous ordnance' results from the myriad of applicable definitions and layered exceptions listed separately in the Revised Code." *In re S.R.*, 182 Ohio App.3d 803, 2009-Ohio-3156, 915 N.E.2d 389, ¶ 13 (12th Dist.). Pursuant to R.C. 2923.17(A), "No person shall knowingly acquire, have, carry, or use any dangerous ordnance." R.C. 2923.11 defines "dangerous ordnance" according to what it is, as included within section (K) and what it is not, as excluded within section (L). Pertinent to the present appeal, the definition is as follows:

(K) "Dangerous ordnance" means any of the following, except as provided in division (L) of this section:

(1) Any automatic or ***sawed-off firearm***, zip-gun, or ballistic knife;

* * *

(L) "Dangerous ordnance" does not include any of the following:

(1) Any firearm, including a military weapon and the ammunition for that weapon, and regardless of its actual age, that employs *a percussion cap or other obsolete ignition system*, or that is designed and safe for use *only with black powder*;

(2) Any pistol, rifle, or shotgun, designed or suitable for sporting purposes, including a military weapon as issued or as modified, and the ammunition for that weapon, *unless the firearm is an automatic or sawed-off firearm;*

* * *

(Emphasis added.).

{¶ 40} The evidence adduced at trial demonstrated appellant's muzzleloader is a sawed-off muzzleloader, and the muzzleloader was operable at the time of the incident and capable of causing death. Appellant does not dispute these facts. Instead, appellant argues that R.C. 2923.11(L)(1) excludes his muzzleloader from the definition of "dangerous ordnance," because it has an obsolete ignition system. In the alternative, appellant argues that his muzzleloader is excluded because it is designed for safe use only with "loose powder" or "pelletized powder." In support, appellant references no evidence demonstrating an obsolete ignition system,[2] and he appears to acknowledge the

---

[2] At best, appellant references R.C. 2923.16(K)(6), defining an "unloaded" firearm, where that firearm uses an obsolete ignition system, as a weapon that "is uncapped or when the priming charge is removed from the pan." There was no testimony of an obsolete ignition system, and no testimony that the muzzleloader used a priming pan.

17.

muzzleloader is designed for use with pelletized powder, and not exclusively black powder as provided under R.C. 2923.11(K)(1) as an exception to "dangerous ordnance."

{¶ 41} As previously noted, appellant argued at trial that his muzzleloader was not a firearm because it is "a black powder muzzleloader with a precision [sic] cap." However, the evidence conclusively demonstrated the muzzleloader used a primer ignition system, and not a percussion cap ignition system. There was also no testimony that a primer ignition system constitutes an "other obsolete ignition system." The evidence also demonstrated that the muzzleloader uses powder pellets, or pelletized powder, and not exclusively black powder.

{¶ 42} Appellant argues that the lack of evidence does not prevent his challenge on appeal, based on the state's burden of producing evidence of "dangerous ordnance." Therefore, appellant believes it proper to introduce "facts" not included in the record, as demonstrative of the state's failure to sufficiently demonstrate the element of "dangerous ordnance." However, based on the record, the state met its burden of demonstrating the muzzleloader met the statutory definition of dangerous ordnance in R.C. 2923.11(K)(1), with no dispute the weapon was a sawed-off muzzleloader, proven by the state to be a firearm.[3] *See, e.g., State v. Nelson,* 8th Dist. Cuyahoga No. 81558, 2003-Ohio-3219, ¶ 49, citing *State v. Jordan,* 89 Ohio St.3d 488, 495, 733 N.E.2d 601 (courts have

---

[3] While not disputed on appeal, a "firearm" is defined as "any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant." R.C.2923.11(B)(1).

determined that a state meets its burden of demonstrating "sawed-off shotgun" element by introducing expert testimony regarding the measurements of the weapon).

{¶ 43} On appeal, however, appellant argues the state was required to also prove his muzzleloader was not obsolete or a black powder firearm, to avoid application of the exception under R.C. 2923.11(L)(1). This argument ignores the evidence adduced at trial, demonstrating a primer ignition system and the ability to safely use other than black powder as a propellant, thus not the type of weapon referenced at R.C. 2923.11(L)(1). Appellant also relies on reasoning that either has no evidentiary support or no statutory support.

{¶ 44} First, appellant argues that his muzzleloader is obsolete, for purposes of the definition at R.C. 2923.11(K) and (L), because it is a muzzleloader, a characteristic wholly distinguishable from the ignition system or powder capabilities referenced in the statute. Simply put, R.C. 2923.11(L)(1) does not define exceptions to "dangerous ordnance" based upon the manner in which the user loads the firearm. In supporting this new argument, appellant cites no evidence in the record but instead relies on a federal patent case in which the United States Supreme Court commented on "modern" breech-loading weapons supplanting the "old muzzle-loading patterns[.]" *See Dashiell v. Grosvenor,* 162 U.S. 425, 427-428, 16 S.Ct. 805, 40 L.Ed.1025 (1896). While muzzleloaders may utilize older technology, there was no evidence that appellant's

firearm utilized an obsolete ignition system or was limited to black powder for safe operation.[4]

{¶ 45} Further undermining appellant's argument that a muzzleloader is an obsolete firearm, appellant acknowledges that his muzzleloader uses a primer ignition system, not listed within section (L)(1). Without any reference to evidence within the record, or even legal authority, appellant concludes that a primer ignition system "is an obsolete ignition system." In the alternative, appellant argues that, even if he concedes the primer ignition system is not obsolete, he still falls within the (L)(1) exception because the muzzleloader is designed for use only with "loose powder" or "pelletized powder." However, R.C. 2923.11(L)(1) excludes only firearms "designed and safe for use *only with black powder.*" The same statute identifies "black powder" and "pellet powders" as separate substances in defining explosives. *See* R.C. 2923.11(M).

{¶ 46} Despite appellant's argument in this case, regarding what constitutes a "dangerous ordnance," the test of sufficiency requires only evidence satisfying the definition of "dangerous ordnance" provided at R.C. 2923.11. The state met this burden by eliciting testimony of a "sawed-off firearm." With no evidence of either an obsolete ignition system or black powder restrictions, we find the law required nothing more.

---

[4] In addition, we note that while R.C. 2923.11(L)(1) identifies obsolete ignition systems *or* the requirement for black powder, other jurisdictions have recognized that "[g]unsmiths cannot freely combine different propellants and ignition systems – firearms technologies work only in specific combinations. Black powder muzzleloaders generally use a 'matchlock, flintlock, percussion cap, or similar early type of ignition system'" rendering them "antique." *Aspilaire v. U.S. Atty. Gen.,* 992 F.3d 1248, 1258 (11th Cir.2021, citing 18 U.S.C. 921(a)(16)(C) and Fla. Stat. 790.001(1).

20.

**{¶ 47}** However, even if the state were required to demonstrate the exception of R.C. 2923.11(L)(1) did not apply, the record in this case contains sufficient evidence to demonstrate the sawed-off muzzleloader did not use a percussion cap or similar obsolete ignition system and the muzzleloader was not designed and safe for use *only* with black powder. Simply put, the evidence presented regarding the muzzleloader's design and operation precluded application of any (L)(1) exception. Based on this record, appellant's challenge to the sufficiency of the evidence regarding his dangerous ordnance conviction fails. Appellant's first assignment of error, accordingly, is not well-taken.

**2. The trial court's misstatement of the law and omission of instruction regarding the (L)(1) exception did not constitute plain error.**

**{¶ 48}** Having found sufficient evidence, we next address the trial court's instructions to the jury, defining "dangerous ordnance." In his second assignment of error, appellant argues the trial court defined "dangerous ordnance" as including "any firearm," and failed to include any instruction regarding an exception for an obsolete ignition system or a weapon designed and safe for use with only "black powder."

**{¶ 49}** As previously stated, we must review the jury instructions as a whole and not based on a single instruction in isolation. *State v. Cunningham,* 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, ¶ 57, citing *State v. Price,* 60 Ohio St.2d 136, 398 N.E.2d 772 (1979), paragraph four of the syllabus. Here, the trial court instructed the jury that, to find appellant guilty, they needed to find he knowingly acquired, had, carried or used any dangerous ordnance, "to wit: a sawed off hand held 50 caliber muzzleloader."

21.

The trial court then defined "dangerous ordnance as "[a]ny automatic or sawed-off firearm" and "[a]ny firearm." The trial court provided no instruction regarding an exception based on an obsolete ignition system or black powder firearm.

{¶ 50} We agree with appellant that "any firearm" does not constitute a dangerous ordnance under the statute. This definition does not appear at R.C. 2923.11(K) or (L). Therefore, the trial court erred in including this definition as part of the jury instructions. To merit reversal on appeal based on the erroneous instruction, however, appellant must demonstrate plain error and prejudicial effect. *Long,* 53 Ohio St.2d at 97, 372 N.E.2d 804. Here, regardless of any error, appellant fails to demonstrate that – but for the incorrect jury instruction – the trial would have ended differently.

{¶ 51} Considering the jury instructions as a whole, the trial court clearly instructed the jury that they must find appellant had "a sawed off hand held 50 caliber muzzleloader" in order to find him guilty, with a "sawed-off firearm" defined as a dangerous ordnance within the statute. Appellant's defense at trial, moreover, was based on argument that the sawed-off muzzleloader was not, legally, a firearm. Therefore, while the trial court erred in defining "dangerous ordnance" as including "any firearm," the jury instructions as a whole directed the jury to determine whether appellant knowingly acquired, had, carried or used any dangerous ordnance, "to wit: a sawed off hand held 50 caliber muzzleloader."

{¶ 52} Appellant next argues that the trial court erred in failing to provide the exception for obsolete or black powder firearms as part of the definition of "dangerous

22.

ordnance." The law required the trial court to provide complete instructions, but the instructions "also must be warranted by the evidence presented." *State v. Nye,* 6th Dist. Wood No. WD-20-058, 2021-Ohio-2557, ¶ 14, citing *Cromer v. Children's Hosp. Med. Ctr. Of Akron,* 142 Ohio St.3d 257, 2015-Ohio-229, 29 N.E.3d 921, ¶ 22 (additional citation omitted.). Contrary to appellant's argument, which is based on evidence never introduced at trial, the trial court was only required to include "instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." *State v. Comen,* 50 Ohio St.3d 206, 210, 553 N.E.2d 640 (1990). As to the exception instruction, therefore, we find no error, let alone plain error. Appellant's second assignment of error, accordingly, is also not well-taken.

### 3. Trial counsel may not be deemed ineffective based on matters beyond the record, and counsel's trial strategy was not demonstrably deficient.

{¶ 53} In his third assignment of error, appellant argues his trial counsel was ineffective by failing to pursue the exception under R.C. 2923.11(L)(1) in cross examination, and in not objecting to the incorrect jury instruction and not requesting an instruction regarding an exception for an obsolete or black powder weapon.

{¶ 54} As to the pursuit of an (L)(1) exception, appellant argues his trial counsel was ineffective based on a theory counsel never argued and a line of questioning counsel never pursued to support that theory. "In a direct criminal appeal, this court's review is limited to evidence presented at trial; we cannot consider matters outside the record before us." *State v. Davis,* 6th Dist. Lucas No. L-05-1056, 2006-Ohio-2350, ¶ 21, citing

23.

*State v. Ishmail,* 54 Ohio St.2d 402, 377 N.E.2d 500 (1978), paragraph one of the syllabus (additional citation omitted.).

{¶ 55} To the extent appellant argues his counsel was deficient in failing to cross examine the state's witnesses to support his theory of an obsolete or black powder weapon, he relies on purported evidence that might have been introduced rather than any citation to error within the record. "Generally, the scope of cross-examination is considered to be within the scope of debatable trial strategy." *State v. Green,* 6th Dist. Wood No. WD-18-029, 2019-Ohio-1176, ¶ 21, citing *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (additional citations omitted.). Furthermore, matters outside the record are not part of our review in a direct appeal. *Davis* at ¶ 21, citing *State v. Carter,* 89 Ohio St.3d 593, 734 N.E.2d 345 (2000). Therefore, appellant fails to demonstrate any deficiency in his trial counsel's performance, and his claim of ineffective assistance based on a failure to pursue an exception under R.C. 2923.11(L)(1) is without merit in this appeal.

{¶ 56} Additionally, appellant argues his trial counsel was ineffective in failing to object to the erroneous jury instruction. As previously addressed, the trial court did err in defining "dangerous ordnance" as "any firearm." However, to merit reversal based on ineffective assistance of counsel for the failure to object, appellant must demonstrate deficient performance and prejudicial effect. *Strickland* at 687. As addressed in our plain error review, there is no indication that the trial court's error resulted in any prejudicial effect.

24.

{¶ 57} Finally, appellant argues ineffective assistance based on his trial counsel's failure to request an instruction regarding an (L)(1) exception, based on an obsolete ignition system or black powder restriction. Based on our determination that there was no evidence in the record of the trial to merit such an instruction, it was not ineffective assistance of counsel to fail to request that instruction. "The failure to do a futile act cannot be the basis for a claim of ineffective assistance of counsel, nor could such a failure be prejudicial." *State v. Walker,* 6th Dist. Lucas No. L-22-1032, 2023-Ohio-140, ¶ 35, quoting *State v. Martinez,* 8th Dist. Cuyahoga No. 101474, 2015-Ohio-1293, ¶ 22.

{¶ 58} With our consideration limited to the record on appeal, any error by the trial court in defining "dangerous ordnance" resulted in no prejudice to appellant. Furthermore, the record did not support including an instruction regarding an exception under R.C. 2923.11(L)(1). We therefore find appellant's third assignment of error not well-taken.

## C. Inducing Panic

{¶ 59} Within his remaining assignments of error, appellant argues in his fourth assignment of error that his conviction for inducing panic lacked sufficient evidence based on the insufficiency of evidence to support the possession of a dangerous ordnance conviction. In his fifth assignment or error, he argues that his inducing panic conviction lacked sufficient evidence of intent to cause panic or reckless disregard of the likelihood of serious public inconvenience or alarm.

25.

### 1. The state presented sufficient evidence of an underlying offense.

{¶ 60} The jury found appellant guilty of inducing panic, in violation of R.C. 2917.31(A)(3) and (C)(1)(4)(a), requiring proof that he caused the evacuation of a public place or serious public inconvenience or alarm by committing an offense with reckless disregard of the likelihood that it will cause serious public inconvenience or alarm, and the offense resulted in economic harm of $1,000.00 or more, but less than $7,500.00.[5] In considering sufficiency, we view the evidence most favorably for the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Smith,* 80 Ohio St.3d at 113, 684 N.E.2d 668. Sufficient evidence is evidence that is adequate to sustain the verdict. *Thompkins,* 78 Ohio St.3d at 386, 678 N.E.2d 541.

{¶ 61} Appellant first argues that there was insufficient evidence of an offense, lacking sufficient evidence to sustain the underlying conviction, possession of a dangerous ordnance. Having rejected appellant's sufficiency challenge to the conviction for possession of a dangerous ordnance, this argument fails. Accordingly, appellant's fourth assignment of error is not well-taken.

### 2. The state presented sufficient evidence of reckless disregard

{¶ 62} Appellant next argues that, because appellant desired to commit suicide rather than cause panic, there is insufficient evidence of intent to support his conviction

---

[5] Appellant raises no challenge to the economic harm element of the offense, and the record contains evidence of the amounts incurred by the various public entities due to the lock-down and the public safety response.

26.

for inducing panic. In support, he argues he never pointed the muzzleloader at anyone and made no move to approach anyone or enter any building. In essence, appellant argues it was his Second Amendment right to sit near the entrance to the courthouse, making statements "about wanting to die," while holding a loaded, sawed-off muzzleloader with the hope of provoking a police response that would end with his death, and "that such an act should not cause alarm or serious public inconvenience."

{¶ 63} While not crediting appellant's argument that he had a right to engage in the conduct that resulted in building lock-downs and the rapid response of numerous public safety agencies, we agree with the state's position that appellant's intent was irrelevant. Pursuant to R.C. 2917.31(A)(3), evidence that appellant committed the offense of possession of a dangerous ordnance with "reckless disregard" was sufficient to support his conviction.

{¶ 64} The culpable mental state of recklessness is defined at R.C. 2901.22(C) as follows:

A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist.

27.

{¶ 65} At trial, the state introduced appellant's own statements, demonstrating his desire for making some headlines as well as his goal of ending his own life by forcing the police to shoot him on the courthouse sidewalk. We consider conduct that is likely to result in a public response, such as building lock-downs and a police shooting, to fall within the realm of recklessness, or a heedless indifference to "a substantial and unjustifiable risk that the persons' conduct is likely to cause a certain result or is likely to be of a certain nature."

{¶ 66} Appellant admittedly wished for a public suicide at the hands of the police. His conduct led to a significant public response, including building lock-downs, the implementation of active shooter protocols and sheltering in place, and barricaded roads to establish a safety perimeter. The response to appellant's actions required mobilization of numerous public safety officers, to ensure no harm came to those in the vicinity of appellant and his firearm, and caused inconvenience and alarm to the affected government personnel and citizens inside the buildings.

{¶ 67} While "serious public inconvenience or alarm" is not defined within R.C. 2917.31(A)(3), the purpose of the law is to avoid harm that might result from panic. *State v. Dulaney,* 180 Ohio App.3d 626, 2009-Ohio-79, 906 N.E.2d 1147, ¶ 21 (3d Dist.), citing 1973 Committee Comment to H.B. 511. Accordingly, where there is "evidence presented to the trial court that the business and its employees were locked in, or inconvenienced, for a period of time," the evidence demonstrates "serious public inconvenience or alarm" in response to a perceived threat. *Dulaney* at ¶ 22; *c.f. State v.*

28.

*Kristofferson,* 1st Dist. Hamilton No. C-010322, 2002 WL 252427 (Feb. 22, 2002) (threat of suicide within a private home did not result in any *public* inconvenience despite officers' response to the scene).

{¶ 68} In this case, the evidence, viewed most favorably for the prosecution, satisfied the requirement for sufficiency. Appellant admitted to attempting a public suicide at the hands of police, with a desire to make headlines, and his conduct resulted in a large, public response that caused inconvenience and alarm. Appellant's claim of insufficient evidence of an intent or recklessness, accordingly, is without merit.

{¶ 69} We therefore find appellant's fifth assignment of error not well-taken.

### IV. Conclusion

{¶ 70} Having found substantial justice has been done, we affirm the judgment of the Williams County Court of Common Pleas. Appellant is ordered to pay costs pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.                                      _____

                                                                       JUDGE

Gene A. Zmuda, J.                                    _____

Myron C. Duhart, P.J.                               JUDGE
CONCUR.

                                                                      _____

                                                     JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.